965 So.2d 79 (2007)
Quawn M. FRANKLIN, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-1267.
Supreme Court of Florida.
June 21, 2007.
Rehearing Denied September 10, 2007.
*83 James S. Purdy, Public Defender, and Christopher S. Quarles, Assistant Public *84 Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm the conviction and sentence.

Facts and Procedural History
Quawn M. Franklin was charged with attempted armed robbery and first-degree murder in the shooting death of Jerry Lawley in Lake County in December 2001. Lawley's murder was the third violent crime committed by Franklin in the span of two weeks.
Franklin was sixteen years old when he was sentenced to ten years in prison for the robbery of Clarence Martin in 1993. He was granted conditional release from prison on October 1, 2001. On December 18, 2001, Franklin ambushed pizza delivery man John Horan in Leesburg. Franklin bound Horan with duct tape, drove him to another location, and then shot Horan in the back, killing him.[1] On December 27 or 28, Franklin and codefendant thirteen-year-old Pamela McCoy committed a forced invasion of the home of Alice Johnson in Leesburg. Franklin struck Johnson in the head with a hammer and stole her Toyota Camry. Johnson suffered severe injuries from this attack when pieces of her skull imbedded in her brain. Following the attack, Johnson was unable to live on her own or participate in civic and volunteer activities.[2]
On December 28, Franklin drove Johnson's stolen vehicle from Leesburg to St. Petersburg to visit relatives. Franklin was accompanied by McCoy and cousins Antwanna and Adrian Butler. Late in the evening, the Butler cousins told Franklin that they wanted to return to Lake County. However, none of the group had money and Franklin had to borrow ten dollars from one of his relatives in order to buy gas for the return trip. While driving back to Lake County, Franklin showed Antwanna Butler a .357 magnum revolver he had obtained from one of his relatives in St. Petersburg. In Leesburg, Franklin stopped at the Elberta Crate and Box Factory and asked directions from the security guard, Jerry Lawley. Franklin then took the Butler cousins to an apartment building near their home. He told Antwanna Butler that he was going to return to St. Petersburg. He also stated that he was going "to get" the security guard.
Franklin returned to the crate factory in the early morning hours of December 29, 2001. He ordered Lawley out of his vehicle at gunpoint. While Lawley was complying and on his knees in the factory parking lot, Franklin shot Lawley once in the back. In statements made by Franklin after his apprehension, he stated that he shot Lawley because he "didn't have no other choice. . . . What I did, I wanted to do it at the time." Franklin rifled Lawley's pockets and also searched Lawley's car. However, Franklin found nothing of *85 value and was unable to get Lawley's car to move. Franklin left the scene and fled to St. Petersburg.
After being shot, Lawley sought help from a company truck driver, Edward Ellis. Ellis had arrived at the crate factory earlier in the evening, parked his truck in the lot, and gone to sleep in the truck cab. Lawley drove his car a short distance across the crate factory grounds to where Ellis's truck was parked. Lawley pounded on the cab of Ellis's truck and shouted that he had been shot. Lawley told Ellis that a tall black male wearing a knit cap had shot him. Lawley also told Ellis that the man was driving a relatively new blue car and had tried to rob him. Ellis called 911 at 5:44 a.m., and Leesburg Police Officer Joseph Iozzi responded to the scene.[3] Lawley also told Officer Iozzi that a thin black male, approximately six feet tall and wearing a knit cap, had ordered him from his car at gunpoint, told him to lie on the ground, and then shot him in the back while he was doing as told. Lawley also told the officer that the man had left the scene in a newer model blue, four door car, possibly a Pontiac.
During the early morning hours of December 30, a St. Petersburg police officer came upon a blue 2000 Toyota Camry in which Franklin was asleep in the driver's seat and codefendant McCoy was asleep in the passenger seat. Franklin was wearing gloves, and the officer found a revolver under the driver's seat. Crime scene technicians found a spent .357 caliber shell casing and five rounds of live ammunition in the revolver. They also located a black knit skull cap in the trunk of the car. The St. Petersburg officer took Franklin and McCoy into custody. After being informed of his rights, Franklin agreed to give a statement to the police, in which he admitted shooting Lawley. Franklin also stated that he had intended to rob Lawley, but Lawley had nothing of value he could take, that he shot Lawley because he "wanted to," and that he wore gloves so that he would not leave any fingerprints. In his statement to the St. Petersburg police, Franklin said that all of the companions who had made the original trip to St. Petersburg were in the car at the time of the shooting. However, Franklin later contradicted this statement in an interview with a reporter when he stated that only McCoy was with him during the shooting. Antwanna Butler also testified that she and her cousin had been dropped off at their home by Franklin and that they were not present during the shooting of Lawley.
While awaiting trial in the Lake County jail, Franklin contacted a newspaper reporter from the Orlando Sentinel and gave an interview in which he incriminated himself in Lawley's murder. While parts of the taped interview were redacted, the trial court overruled Franklin's objections to three other passages, which were played at trial. The objectionable portions included Franklin's statements that he had decided to confess because he was "tired of life" and "tired of being treated just like an animal"; that he saw a helicopter looking for the car he was in and that he was hiding from the helicopter; and that he had committed the crime, but that "the people, the world, life" were the cause of his actions and that he was tired of people watching him and hating him and that he hated life. Defense counsel posed a relevance objection to the statements about Franklin's motivation in confessing and objected that the statements about hiding from the helicopter could be interpreted as evidence that the car had been stolen or that the police were looking for Franklin for some other reason. Defense counsel *86 renewed these objections at trial when the tape was introduced into evidence.
Franklin filed a number of pretrial motions. These motions included a challenge of Florida's death sentencing scheme in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); a request for a statement of particulars as to the aggravating circumstances and the State's theory of prosecution; a request that the jury be required to render a unanimous verdict as to penalty; challenges to the constitutionality of Florida's death penalty statute on a number of grounds, including that the admission of hearsay evidence during the penalty phase violated the constitutional right to confront witnesses; challenges to the constitutionality of several aggravating factors; a challenge to the constitutionality of victim impact evidence and, in the alternative, a request that the court limit its introduction; a proposed modification to the standard jury instructions based on Ring and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); a request to limit certain prosecutorial arguments and "misconduct"; a motion to prohibit challenges to prospective jurors based on their personal reservations about the death penalty; a motion for the exclusion of evidence creating sympathy for the victim; and a request for a special verdict form indicating whether the jury found Franklin guilty of premeditated or felony murder. After hearing argument on the various motions, the trial court denied most of them. The court did grant Franklin's motion for a special penalty phase verdict form that would indicate the jury's vote as to the applicable aggravating factors.
During the State's case in chief, defense counsel made a hearsay objection to the testimony of truck driver Ellis and Officer Iozzi, who related Lawley's statements to them after he was shot. The trial court overruled defense counsel's objections and permitted both witnesses to testify about what Lawley had said to them. The trial court ruled that the statements were admissible as either spontaneous statements, excited utterances, or an existing physical condition under the hearsay exceptions contained in section 90.803, Florida Statutes (2001). Both witnesses testified that Lawley stated he had been shot by a tall, thin black man wearing a knit cap and driving a blue, four-door car; that the shooter had searched through Lawley's pockets and car; and that Lawley was in a great deal of pain and having difficulty breathing after being shot.
Antwanna Butler testified that Franklin showed her a big silver or chrome revolver on the trip back to Leesburg from St. Petersburg and that Franklin stated his intent to go back and "get" the security guard after dropping off Butler and her cousin in the early morning hours of December 29. The jury also heard Franklin's audiotaped confession to the police and his audiotaped interview with the newspaper reporter. On each tape, Franklin admitted that he killed Lawley and that he had intended to rob him. In the newspaper interview, Franklin also stated that he had intended to take Lawley's car, but had been unable to move it.
The State's other guilt phase witnesses included crime scene technicians, forensic experts, the medical examiner, and various law enforcement officers who either were involved in the investigation or had contact with Franklin while he was in custody. The experts testified that the bullet recovered at the crime scene contained Lawley's DNA and had been fired from the revolver found under the driver's seat of the car in which Franklin was apprehended. The experts also testified that Lawley was shot in the back while kneeling on the ground and *87 died from the injuries inflicted by this single gunshot. The gun was fired from at least five and a half feet away from Lawley. The medical examiner testified that the bullet entered Lawley's left back below his lower rib cage, injured the lower portion of his left lung, bruised the surface of his heart, passed through his diaphragm, passed through his liver, and exited his left upper abdomen. The medical examiner also noted that both of Lawley's knees were scraped and that the exit wound was not "supported" or "shored," indicating that Lawley was not lying on the ground when shot. The jury found Franklin guilty as charged of first-degree murder and attempted armed robbery with a firearm.
During the penalty phase, the State presented a videotaped deposition by the victim of Franklin's 1993 robbery; the testimony of an officer who was at the scene of the Horan murder on December 18, 2001, and the home invasion and attack on Johnson on December 28, 2001; the testimony of Johnson recounting Franklin's attack on her; and the testimony of the officer who investigated Horan's murder. Defense counsel objected to the testimony relating to these previous crimes and to several photos that depicted the earlier crime scenes and the victims, arguing that the testimony and evidence were prejudicial and inflammatory. Defense counsel also stated that Franklin would stipulate to the aggravating factor of prior violent felony convictions in lieu of the State presenting evidence relating to these previous crimes. The trial court overruled the defense objections and refused to accept Franklin's stipulation.
Codefendant McCoy testified that Franklin had obtained a big silver gun while in St. Petersburg; Franklin stated it was going to "hurt a little, but it will only take a second" before he exited his vehicle and ordered Lawley to get on the ground; Lawley asked Franklin not to shoot him; and Franklin shot Lawley in the back while Lawley was kneeling on the ground with his hands behind his head.
Two of Lawley's relatives testified that he was a good and loving person who helped family members and neighbors and that his murder had devastated the family. Lawley's coworker and friend Ellis also testified that Lawley was liked by everyone at work and had no enemies. Defense counsel objected to the presentation of this victim impact evidence, but the trial court overruled the objection.
Defense counsel had subpoenaed Minnie Thomas, the woman who raised Franklin until he was eight years old and whom he called Mom. However, Thomas was either unavailable or unwilling to testify at trial. The court permitted the defense to present Thomas's deposition in lieu of her live testimony. The parties also stipulated to other facts that Thomas would have presented about Franklin's background and family history. The other defense penalty phase witness was Franklin himself who testified about his background and child. Franklin described the trauma of being forcibly removed from the only family he knew when he was eight years old, being taken to St. Petersburg by his biological mother, and his failed attempts to return to the Thomas family in Leesburg by stealing bikes, cars, and money. Franklin also testified about his experiences in juvenile facilities from age nine, including being physically and sexually abused by older boys in the facilities, and his imprisonment in adult prison at age fifteen.
At the conclusion of the penalty phase, the jury returned a unanimous recommendation of a death sentence. The jury also unanimously agreed that four aggravating factors were present: (1) the murder was committed while Franklin was serving a *88 prison sentence because he was on conditional release at the time of Lawley's shooting; (2) Franklin had previous violent felony convictions, including another capital felony for the murder of Horan; (3) Lawley's murder was committed for pecuniary gain; and (4) the murder was cold, calculated, and premeditated (CCP). The trial court followed the jury's recommendation and imposed a death sentence. In its sentencing order, the trial court found the same four aggravating factors, rejected Franklin's age as a statutory mitigating factor, and found a number of nonstatutory mitigating factors.[4] The trial court concluded that the aggravating factors outweighed the mitigating factors. The trial court also sentenced Franklin to a consecutive life sentence for the attempted armed robbery of Lawley.
In his appeal to this Court, Franklin raises eight issues. He claims that (1) the admission of hearsay statements relating to his prior violent felony convictions during the penalty phase violated his constitutional right to confront witnesses in light of the United States Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); (2) the trial court erred in admitting the objected  to portions of Franklin's taped interview with the newspaper reporter; (3) the guilt phase admission of hearsay statements made by the victim also constituted a Crawford violation; (4) the trial court erred by refusing to accept Franklin's stipulation to his prior violent felony convictions in lieu of testimony regarding the crimes; (5) improper victim impact evidence was presented to the jury; (6) the CCP aggravating factor was not properly found; (7) the pecuniary gain aggravating factor was not properly found; and (8) Florida's capital sentencing statute is facially unconstitutional under Ring because the judge rather than the jury determines the sentence to be imposed. We address each claim in turn below.

Crawford v. Washington Claims
Franklin claims that certain hearsay statements admitted during the guilt and penalty phases of his trial violated his right to confront witnesses under the Sixth Amendment of the United States Constitution,[5] as explained in the United States Supreme Court's recent decision in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Franklin asserts that it was error for the trial court to allow a police detective to testify during *89 the penalty phase about the injuries sustained by a previous victim when she was attacked by Franklin and struck on the head with a hammer. Over a defense objection that the detective was not qualified to testify about the extent of victim Alice Johnson's injuries, the detective testified that the doctor who treated Johnson at the hospital stated that pieces of Johnson's skull had been broken off by the hammer blows and were imbedded in her brain.
Franklin also asserts that it was error to permit Officer Iozzi and truck driver Ellis to testify during the guilt phase about Lawley's statements concerning the shooting, including Lawley's description of the shooter and the vehicle driven by the shooter. Over a defense hearsay objection, the trial court ruled that Lawley's statements were admissible as an exception to the rule against hearsay testimony. On appeal, both parties seem to agree that the statements at issue fit under the excited utterance exception, which authorizes the admission of "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," notwithstanding the general prohibition against hearsay. § 90.803(2), Fla. Stat. (2005).
Initially, the State contends that none of these Crawford claims were preserved for appellate review by a proper objection. Franklin filed pretrial motions to prohibit the State from using hearsay evidence at the penalty phase as provided in section 921.141(1), Florida Statutes (2005),[6] and to have the statute declared unconstitutional for violating his right to confront witnesses. The trial court denied these pretrial motions. Franklin also offered to stipulate to the aggravating factor of prior violent felony convictions in order to prevent the jury from hearing the details of his prior crimes. However, the court rejected this stipulation and permitted the State to present penalty phase testimony and evidence that related the details of Franklin's other crimes. While Franklin's objection to the detective's penalty phase testimony was not directed to its nature as hearsay or as a violation of his right to confront the witnesses against him, we conclude that he adequately preserved the issue through his pretrial motions. Section 90.104(1)(b), Florida Statutes, covering rulings on evidence, was amended in 2003 to add the following language: "If the court has made a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." See ch.2003-259, § 1, at 1298, Laws of Fla. (codified at § 90.104(1)(b), Fla. Stat. (2005)). Thus, Franklin was not required to renew his objection to the penalty phase evidence in order to preserve his confrontation claim for appellate review.
The State also argues that Franklin's hearsay objection to the guilt phase testimony regarding Lawley's statements did not preserve any Crawford claim. We agree. Franklin's pretrial motion did not address any guilt phase confrontation issues. However, even if these guilt phase *90 claims had been properly preserved, they would be without merit as explained below.
In considering Confrontation Clause claims, we are guided by the following principles. The standard for determining whether the admission of a hearsay statement against a criminal defendant violates the right of confrontation was recently modified by the Supreme Court in Crawford. Before Crawford, the issue was controlled by Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), which held that a hearsay statement could be admitted in a criminal trial without violating the right of confrontation if it was shown that the declarant was unavailable and the out-of-court statement bore adequate indicia of reliability. This test focused on the reliability of the statement. As explained in Roberts, a statement had adequate indicia of reliability if it either fell within a firmly rooted hearsay exception or if it bore "particularized guarantees of trustworthiness." Id.
In Crawford, the Supreme Court dispensed with the Roberts reliability analysis for testimonial hearsay statements and held that the admission of a hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment if (1) the statement is testimonial, and (2) the declarant is unavailable and the defendant lacked a prior opportunity for cross-examination of the declarant. The Court emphasized that if "testimonial" evidence is at issue, "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Crawford, 541 U.S. at 68, 124 S.Ct. 1354. "Only [testimonial] statements . . . cause the declarant to be a `witness' within the meaning of the Confrontation Clause." Davis v. Washington, ___ U.S. ___, ___, 126 S.Ct. 2266, 2273, 165 L.Ed.2d 224 (2006). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." Id. Thus, we must initially determine whether the statements at issue in the instant case were testimonial.
While Crawford did not establish a precise definition of the term "testimonial," the Supreme Court did provide some guidance, holding that, at a minimum, statements are testimonial if the declarant made them "at a preliminary hearing, before a grand jury, or at a former trial; and [in] police interrogations." Crawford, 541 U.S. at 68, 124 S.Ct. 1354. Beyond this explicit guidance, the Supreme Court discussed three formulations of statements that might qualify as testimonial, namely: (1) "ex parte in-court testimony or its functional equivalent  that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52, 124 S.Ct. 1354 (quoting Brief for Petitioner at 23; White v. Illinois, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., concurring in part and concurring in judgment); Brief for National Association of Criminal Defense Lawyers at 3).
Following Crawford, the Supreme Court has provided further guidance in determining when statements made in the course of police interrogations are testimonial. As the Supreme Court explained in *91 Davis v. Washington, the distinction rests on the primary purpose of the interrogation. 126 S.Ct. at 2273-74. "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Id. at 2273. In contrast, such out-of-court statements are testimonial "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Id. at 2273-74. Davis left open the question of "whether and when statements made to someone other than law enforcement personnel are `testimonial.'" Id. at 2274 n. 2.
This category of statements bears upon at least one of Franklin's claims here, namely the admission of the statement Lawley made to his friend and coworker Ellis immediately after being shot. Most courts agree that a spontaneous statement to a friend or family member, such as Lawley's statement to Ellis, is not likely to be testimonial under Crawford. See, e.g., People v. Vigil, 127 P.3d 916, 927-28 (Colo. 2006) (holding that an excited utterance a child made to his father and his father's friend immediately after a sexual assault was not testimonial); State v. Rivera, 268 Conn. 351, 844 A.2d 191, 205 (2004) (holding that statement declarant made in confidence and on his own initiative to a close family member was not testimonial); Demons v. State, 277 Ga. 724, 595 S.E.2d 76, 80 (2004) (holding that an excited utterance made to a friend was not testimonial); Woods v. State, 152 S.W.3d 105, 114 (Tex. Crim.App.2004) (holding that a codefendant's spontaneous statements to two different third-party acquaintances were not testimonial because they were casual, spontaneous "street corner" statements), cert. denied, 544 U.S. 1050, 125 S.Ct. 2295, 161 L.Ed.2d 1092 (2005); State v. Manuel, 281 Wis.2d 554, 697 N.W.2d 811, 824 (2005) (holding that a statement made by a declarant to his girlfriend in their apartment implicating the defendant in a murder was not testimonial). In fact the Supreme Court even recognized that a person who makes a casual remark to an acquaintance does not "bear testimony" in the sense that "[a]n accuser who makes a formal statement to government officers" does. Crawford, 541 U.S. at 51, 124 S.Ct. 1354; see also United States v. Manfre, 368 F.3d 832, 838 n. 1 (8th Cir.2004) (noting comments made to "loved ones or acquaintances . . . are not the kind of memorialized, judicial-process-created evidence of which Crawford speaks").
In the instant case, the circumstances surrounding Lawley's statements to Ellis indicate that the statements were not testimonial. Lawley spontaneously made the statements to his friend. Lawley pounded on Ellis's truck in order to summon assistance and to relay to his friend what had happened to him. Additionally, Lawley made these statements in the midst of a medical emergency: he had just been shot and was struggling for breath. Thus, even if this claim had been preserved by a proper objection, Franklin would not be entitled to relief because Lawley's excited utterances to his friend Ellis were not testimonial.
The other two statements that Franklin claims as error were made to police officers during the course of police questioning in a criminal investigation. In the wake of Crawford, the courts have reached varying conclusions as to the testimonial nature of such statements. Compare Commonwealth v. Gonsalves, 445 Mass. 1, 833 N.E.2d 549, 555 (2005) (holding that the term interrogation "must be *92 understood expansively to mean all law enforcement questioning related to the investigation or prosecution of a crime"), cert. denied, ___ U.S. ___, 126 S.Ct. 2980, 165 L.Ed.2d 990 (2006), and cert. denied, ___ U.S. ___, 126 S.Ct. 2982, 165 L.Ed.2d 989 (2006), with People v. King, 121 P.3d 234, 240 (Colo.Ct.App.2005) (holding that where the statements were made to police in a noncustodial setting, without indicia of formality, and while the victim was under considerable pain and distress, the statements could not be viewed by any reasonable person as being made with the expectation that they would be used prosecutorially and thus were nontestimonial), cert. denied, No. 05SC179, 2005 WL 3073374 (Colo. Oct 17, 2005).
In Davis, the Supreme Court recently addressed the testimonial status of several statements made by declarants in response to police interrogations. Davis actually involved two separate cases decided by the Washington and Indiana Supreme Courts, State v. Davis, 154 Wash.2d 291, 111 P.3d 844 (2005), and Hammon v. State, 829 N.E.2d 444 (Ind.2005). See Davis v. Washington, 126 S.Ct. at 2270-73. In both cases, the trial courts had admitted statements made by victims of domestic battery and the defendants argued that the admission of the statements, in the absence of the declarant's testimony at trial, violated their Sixth Amendment right to confrontation. In Davis, the relevant statements were made to a 911 emergency operator as the declarant was actually being attacked by the defendant. The declarant identified Davis as the assailant. In Hammon, the relevant statements were made to police officers who had responded to a domestic dispute call. The declarant recounted to the police the details of a previous attack by the defendant. The Supreme Court concluded that the statements made during the 911 call in Davis were nontestimonial, while the statements to the police officers in Hammon were testimonial. As explained by the Supreme Court, the distinction rests on the primary purpose of the interrogation in each instance. Davis, 126 S.Ct. at 2273-74.
In Davis, the questioning by the 911 operator was to enable the responding officers to meet an ongoing emergency. The Supreme Court noted the following circumstances in Davis: the declarant was speaking about events as they were actually happening; the declarant was facing an ongoing emergency and made the 911 call in order to seek help against a bona fide physical threat; the elicited statements were crucial to resolving the ongoing emergency (i.e., the 911 operator asked who was attacking the caller, whether the attacker was using a weapon, and whether the attacker had been drinking); and the declarant was giving frantic answers over the phone in the midst of hectic events and an unsafe environment. 126 S.Ct. at 2276-77.
In contrast, the Supreme Court concluded that the primary purpose of the interrogation in Hammon was to establish or prove past events potentially relevant to later criminal prosecution. The Supreme Court noted very different circumstances surrounding the interrogation in Hammon: there was no emergency in progress when the officers arrived; the declarant was alone on the front porch and told the officers that she was fine and in no immediate danger; the officer questioned the declarant in a separate room about "what had happened"; the declarant delivered a narrative of past events removed in time from the danger she described; and the officer asked the declarant to execute a written affidavit in order to establish the events that had occurred previously. The Supreme Court described these statements in Hammon as "an obvious substitute for live testimony, because they do *93 precisely what a witness does on direct examination; they are inherently testimonial." 126 S.Ct. at 2278.
Applying the reasoning of Davis to the instant case, we conclude that the victim's statements to the responding officer that were introduced during the guilt phase of trial were not testimonial in nature.[7] The circumstances of the officer's questioning indicate that its primary purpose was to assist in an ongoing emergency. Lawley was under considerable pain and distress and was having difficulty breathing when he was responding to the officer's questions. These statements were made shortly after Lawley had been shot and before emergency personnel had even arrived on the scene. There were no indicia of formality in this questioning by the officer.
As to the penalty phase evidence claim, we conclude that the physician's statements to the police detective about an earlier victim's injuries were testimonial under the standards laid out in Davis. These statements were made by the doctor in response to questioning by a detective who was investigating an already completed crime. There was no ongoing emergency that needed to be resolved. The purpose of the detective's questioning was inherently testimonial. Thus, it was error to admit this testimony over defense objection. However, a confrontation error is subject to harmless error analysis. See United States v. McClain, 377 F.3d 219, 222 (2d Cir.2004) ("It is well established that violations of the Confrontation Clause, if preserved for appellate review, are subject to harmless error review . . . and Crawford does not suggest otherwise."). Essentially the same information that the detective related about Johnson's injuries was presented through Johnson's own testimony. She stated that she had been independent and involved in community affairs before Franklin hit her on the head with a hammer, but now she is unable to live on her own, unable to drive her car, confined to a wheelchair, and unable to participate in community events. Thus, we conclude that there is no reasonable possibility that any error in admitting the doctor's hearsay statements about Johnson's injuries contributed to the death sentence recommended by the jury. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986).
For the reasons explained above, we conclude that Franklin is not entitled to relief on his Crawford claims, either because the claims were not preserved for appellate review or are without merit.

Defendant's Statements to Newspaper Reporter
While awaiting trial, Franklin contacted a newspaper reporter and gave an interview in which he made inculpatory statements about Lawley's shooting. The parties agreed to redact those portions of the taped interview in which Franklin discussed the other crimes he had committed. However, Franklin also wanted three other portions of the tape redacted, including statements that Franklin had decided to confess because he was "tired of life" and "tired of being treated just like an animal"; that he saw a helicopter looking for the car he was in and that he was hiding from the helicopter; and his admission that he committed the crime, but that "the people, the world, life" were the cause of his actions and that he was tired of people watching him and hating him and that he hated life.[8] *94 Defense counsel posed a relevance objection to the statements regarding Franklin's motivation in confessing. He objected to the helicopter statement on the grounds that the jury might speculate that the car Franklin occupied had been stolen or had been used for some other crime. Defense counsel renewed these objections when the tape was admitted during the guilt phase of trial, but the court overruled the objections and admitted these portions of the taped interview. Franklin argues that the introduction of this evidence at the guilt phase was unfairly prejudicial.
Under Florida law, all relevant evidence, defined as that tending to prove or disprove a material fact, is admissible unless otherwise provided by law. See §§ 90.401-90.402, Fla. Stat. (2005). Relevant evidence is inadmissible, however, where the probative value is substantially outweighed by the danger of unfair prejudice. See § 90.403, Fla. Stat. (2005). The admissibility of evidence is within the sound discretion of the trial court, and the trial court's determination will not be disturbed on appellate review absent a clear abuse of that discretion. See, e.g., Brooks v. State, 918 So.2d 181, 203 (Fla.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2294, 164 L.Ed.2d 820 (2006); Ray v. State, 755 So.2d 604, 610 (Fla.2000); Zack v. State, 753 So.2d 9, 25 (Fla.2000).
The basis of Franklin's objection to the helicopter statement was highly speculative. The jury knew that Lawley had identified his assailant and the car he was driving. It was logical that the police would be looking for this vehicle near the murder scene. Franklin's statement that he hid from the helicopter and fled to St. Petersburg was relevant to explaining his subsequent arrest in St. Petersburg while seated in the driver's seat of the car. Nothing in this statement would give the jury any hint that the car in question was stolen or that it was being sought in another crime. Thus, Franklin has not shown that the trial court abused its discretion by allowing this statement into evidence.
Franklin objected to the other two statements on the grounds of relevancy. The State argues that these statements were relevant to Franklin's motivation for confessing and talking to the reporter. However, Franklin's motivation for talking to the reporter was not germane to the question of his guilt or innocence. While Franklin's admission to the reporter that he "did it" (shot Lawley) was relevant, his other statements surrounding this one-sentence *95 admission were not relevant to any issue in the case. Moreover, this one-sentence admission was not Franklin's only confession to the crime. The jury heard Franklin's statement to the police in which he admitted shooting Lawley and that he had intended to rob him. Thus, we conclude that the trial court abused its discretion in admitting these statements, other than the admission of guilt.
However, we conclude that any error in admitting Franklin's statements to the reporter was harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986). Even without these statements, the jury heard Franklin's confessions to the police, Lawley's description of the events and his assailant, and the forensic evidence that tied Franklin's gun to the shooting. Thus, we conclude that these statements did not contribute to the jury's guilty verdict. As to the imposition of the death sentence, the jury knew about Franklin's status of imprisonment at the time of the crime, heard about his recent violent crime spree and his history of violent crimes, heard about the pecuniary gain motive for the shooting in Franklin's own statements, and heard the CCP circumstances of the murder. Thus, we conclude that there is no reasonable probability that Franklin's statements about disillusionment with life contributed to the jury's recommendation of a death sentence. Franklin is not entitled to relief on this claim.

Stipulation to Prior Violent Felony Convictions
Prior to the introduction of the penalty phase testimony, Franklin offered to stipulate to the aggravating factor of prior violent felony convictions in order that the details of his prior crimes not be presented to the jury. Defense counsel argued that the violent nature of these prior crimes would unduly prejudice the jury. The State responded that Florida law allows for the presentation of this evidence and that the evidence would not be improper. The trial court permitted the evidence to be presented. Two of the victims of Franklin's previous crimes presented factual testimony regarding the circumstances of the crimes and two law enforcement officers also testified about the details of the crimes.
Franklin now claims that the trial court's refusal to accept his stipulation violated the Supreme Court's decision in Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). In Old Chief, the Supreme Court held that a federal district court abused its discretion by refusing the defendant's offer to stipulate to the fact of a prior felony conviction, and instead admitted the full record of his prior judgment "when the name or nature of the prior offense raised the risk of a verdict tainted by improper considerations, and when the purpose of the evidence is solely to prove the element of prior conviction." Id. at 174, 117 S.Ct. 644. Old Chief involved the defendant's stipulation of his "convicted felon status," which was an element of the firearms violation that had to be proven. In Brown v. State, 719 So.2d 882, 884 (Fla.1998), this Court recognized the holding in Old Chief and held that "when a criminal defendant offers to stipulate to the convicted felon element of the felon-in-possession of a firearm charge, the Court must accept that stipulation, conditioned by an on-the-record colloquy with the defendant acknowledging the underlying prior felony conviction(s) and acceding to the stipulation."
However, the applicability of Old Chief to the capital sentencing context has been decided adversely to Franklin. See Cox v. State, 819 So.2d 705, 715-16 (Fla.2002). In Cox, this Court explained that it had "explicitly *96 limited" the applicability of Old Chief to "felon-in-possession of a firearm cases." Id. at 716. The Court further explained that it "has not construed Old Chief to have established a rule of law that those found guilty of first-degree murder may simply stipulate to prior violent felony convictions and thereby prohibit the State from introducing any evidence thereof whatsoever." Id.
This case is factually similar to Cox, in which the defendant claimed that the trial court erred in refusing to accept his offer to stipulate to his prior violent felony convictions of robbery of a convenience store, burglary of a home and the battery of the occupants, and a violent sexual battery. The trial court ruled that the State was entitled to decline the offer and present evidence concerning the prior felonies. Id. On appeal, the defendant argued that the introduction of this evidence was contrary to the holding of Old Chief and resulted in a deprivation of his rights to due process and a fair trial. Id. at 716. As noted above, we explained that Old Chief did not require the court to accept a defendant's stipulation of prior violent felony convictions in a capital sentencing proceeding. Id.
"[A]ny relevant evidence as to a defendant's character or the circumstances of the crime is admissible [during capital] sentencing [proceedings]." Stano v. State, 473 So.2d 1282, 1286 (Fla.1985); see also § 921.141(1), Fla. Stat. (2005) ("In the [capital sentencing] proceeding, evidence may be presented as to any matter that the court deems relevant to . . . the character of the defendant. . . ."). In the penalty phase of a capital trial it is appropriate to introduce testimony concerning the details of any prior felony conviction involving the use or threat of violence to the person rather than the bare admission of the conviction. See Tompkins v. State, 502 So.2d 415 (Fla.1986); Stano, 473 So.2d at 1289. Testimony concerning the events which resulted in the conviction assists the jury in evaluating the character of the defendant and the circumstances of the crime so that the jury can make an informed recommendation as to the appropriate sentence. Rhodes v. State, 547 So.2d 1201, 1204 (Fla.1989). Such testimony would also be relevant in determining what weight to give to the prior felony aggravator.
In determining whether a trial court has abused its discretion in admitting evidence of prior violent felony convictions, this Court looks at the tenor of the witnesses' testimony and whether this testimony became a central feature of the penalty phase. See Cox, 819 So.2d at 715-16. In Cox, we noted that the "witnesses tersely related the crimes committed against them, and each was able to do so without any emotional display" and these prior offenses did not become a central feature of the penalty phase. Id. at 715-16.
In the instant case, the witnesses recounted the factual circumstances of the crimes committed against them and did not engage in any editorializing or inflammatory rhetoric. Further, there is no indication on the record that there was any kind of emotional display by the witnesses.[9] Nor can the testimony relating to Franklin's prior convictions be deemed the central feature of the penalty phase. The State presented testimony and evidence to establish each of the aggravating circumstances, *97 including the testimony of Franklin's parole supervisor to establish that the murder was committed while Franklin was under imprisonment and the testimony of codefendant McCoy to establish that the murder was CCP and committed for pecuniary gain. We find no error on this point.

Victim Impact Evidence
In Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that the Eighth Amendment to the United States Constitution did not prevent the State from presenting evidence about the victim, evidence of the impact of the murder on the victim's family, and prosecutorial argument on these subjects, if permitted to do so by state law. Subsequently, the Florida Legislature enacted section 921.141(7), which permits the prosecution to introduce and argue victim impact evidence. See ch. 92-81, § 1, Laws of Fla. Even though victim impact evidence is admissible in a death penalty case, it is limited to evidence "designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." § 921.141(7), Fla. Stat. (2005). "Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence." Id.; see also Payne, 501 U.S. at 830 n. 2, 111 S.Ct. 2597. Additionally, the Florida Constitution contains a victims' rights provision that entitles the victims of crimes, including the next of kin of homicide victims, "to the right to be informed, to be present, and to be heard when relevant, at all crucial stages of criminal proceedings, to the extent that these rights do not interfere with the constitutional rights of the accused." Art. I, § 16, Fla. Const.
In Windom v. State, 656 So.2d 432, 438 (Fla.1995), this Court rejected an argument that the victim impact evidence procedure outlined in section 921.141(7) constituted an impermissible nonstatutory aggravator that should be excluded during the sentencing phase of a capital case. We concluded that the victim impact evidence permitted by the statute did not "impermissibly affect[ ] the weighing of the aggravators and mitigators" or "otherwise interfere[ ] with the constitutional rights of the defendant." Id.
In this case, the testimony of the victim's family members and coworker did not exceed the proper bounds of victim impact evidence as provided in both section 921.141(7) and Payne. Lawley's sister Linda Paulette testified that Lawley was the second oldest child in a family of six children; he took over the role of "father" at age eighteen when his father died and he helped support the family; he was a member of the Army for twenty-five years and served in Vietnam; he allowed two of his sisters to live with him in Leesburg; he planned to retire to Alabama in order to be near the rest of his family; he was a loving and generous person who helped family, friends, and neighbors; and his death had devastated his family. Lawley's coworker and friend Edward Ellis testified that he had known Lawley for at least twelve years; Lawley was a "good guy" who would help others; he had no enemies; and over half of the employees of the crate factory were friends with Lawley and were "hurt pretty bad" by his death. Lawley's sister-in-law Kay Lawley testified that Lawley served two tours of duty in Vietnam; he helped his neighbors by cutting their grass and doing odd jobs for them; he bought clothes, school supplies, and glasses for neighborhood children; his family misses him; and Lawley's sister Carolyn, who had been living with him, has been left without a home or income. This evidence is within the purpose of section *98 921.141(7), which allows the jury to consider "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death." See, e.g., Huggins v. State, 889 So.2d 743, 765 (Fla.2004) (finding statements presented during the penalty phase by the victim's husband, mother, and best friend regarding their relationship with the victim and the loss they suffered due to her murder were appropriate victim-impact evidence under the statute), cert. denied, 545 U.S. 1107, 125 S.Ct. 2546, 162 L.Ed.2d 280 (2005); Farina v. State, 801 So.2d 44, 52 (Fla.2001) (finding no error in admitting testimony by twelve of the victim's friends and family members about the impact of her murder because it came within parameters of Payne). Thus, we conclude that Franklin is not entitled to relief on this claim.

Aggravating Factors
Franklin argues that the trial court erred in finding the CCP and pecuniary gain aggravating factors in his case. In reviewing the finding of an aggravating circumstance, "it is not this Court's function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt  that is the trial court's job. Rather, [this Court's] task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Willacy v. State, 696 So.2d 693, 695 (Fla.1997) (footnote omitted); see also Occhicone v. State, 570 So.2d 902, 905 (Fla.1990) ("When there is a legal basis to support finding an aggravating factor, we will not substitute our judgment for that of the trial court. . . ."); Brown v. Wainwright, 392 So.2d 1327, 1331 (Fla.1981) ("Our sole concern on evidentiary matters is to determine whether there was sufficient competent evidence in the record from which the judge and jury could properly find the presence of appropriate aggravating or mitigating circumstances.").
In the instant case, the jury unanimously found that both the CCP and pecuniary gain aggravators were present. The trial court also found both applicable. The sentencing order shows that the trial court applied the correct rules of law in making these determinations. Thus, the only question for us is whether there is sufficient competent evidence in the record from which the judge and jury could properly find the presence of CCP and pecuniary gain.
In order to find the CCP aggravating factor, the jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification. Jackson v. State, 648 So.2d 85, 89 (Fla.1994).
Premeditation can be established by examining the circumstances of the killing and the conduct of the accused. The CCP aggravator can "be indicated by circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." Swafford v. State, 533 So.2d 270, 277 (Fla.1988). In a number of cases, we have cited the defendant's procurement of a weapon in advance of the crime as indicative of preparation and heightened premeditated design. See, e.g., Bell v. State, 699 So.2d 674, 677 (Fla.1997) (purchasing a gun after stating that he intended to kill *99 the victim); Thompson v. State, 648 So.2d 692, 696 (Fla.1994) (explaining that defendant took precaution of carrying a gun and a knife with him to meeting with victims); Wuornos v. State, 644 So.2d 1000, 1008 (Fla.1994) (noting that defendant had armed herself in advance of attack on victim); Huff v. State, 495 So.2d 145 (Fla. 1986) (stating that defendant brought murder weapon to the scene of the crime); Davis v. State, 461 So.2d 67 (Fla.1984) (same); Eutzy v. State, 458 So.2d 755, 757 (Fla.1984) (finding that defendant procured gun in advance). Taking a victim to an isolated location or choosing an isolated location to carry out an attack can also be indicative of a plan or prearranged design to kill. See, e.g., Thompson (driving victims to an isolated area and forcing them to lie on the ground); Wuornos (luring victim to isolated location). Lack of resistance or provocation by the victim can indicate both a cold plan to kill as well as negate any pretense of justification. See, e.g., Thompson (noting that there was no indication that one of the victims resisted the defendant); Eutzy (noting no evidence of a struggle); Williamson v. State, 511 So.2d 289 (Fla.1987) (finding no pretense of justification for stabbing fellow inmate where victim had made no threatening acts toward defendant). The manner in which a murder is carried out can also indicate a cold and calm plan. See, e.g., Eutzy (shooting victim once in the head execution-style).
The killing in the instant case has all of the hallmarks of CCP. Franklin procured a weapon earlier in the day, long before he actually chose his victim. Franklin engaged the victim in conversation earlier in the night and was able to assess the surroundings and the victim's situation, i.e., a single individual in an isolated location. Franklin stated his intent to return to the location and "get" the victim. When he arrived at the scene, Franklin again voiced his intent to shoot the victim when he told McCoy that "this is gonna hurt, but only for a minute." There was no resistance or struggle by the victim, who complied with Franklin's order to get out of his car and down on the ground and asked Franklin not to shoot him. However, while the victim was complying with Franklin's orders, Franklin shot him in the back without provocation. Further, Franklin took no precautions to hide his face or his vehicle from the victim, but he did wear gloves in order to avoid leaving his fingerprints at the scene. All of these facts are supported by sufficient competent evidence in the record, either through witness testimony, forensic evidence, or Franklin's own confessions.
Franklin also argues that the trial court erred in finding the pecuniary gain aggravating factor in his case. The pecuniary gain aggravator is applicable in cases where "the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain." Finney v. State, 660 So.2d 674, 680 (Fla.1995). As in the CCP analysis above, this Court's task on appeal is "to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Willacy v. State, 696 So.2d at 695.
This Court has held that killing for the purpose of obtaining a car constitutes commission of a murder for pecuniary gain. See, e.g., Jones v. State, 612 So.2d 1370, 1375 (Fla.1992) (holding that pecuniary gain aggravator was properly found where murder was committed to steal victim's truck); Medina v. State, 466 So.2d 1046, 1050 (Fla.1985) (finding pecuniary gain aggravator proper where murder was committed to obtain victim's car). Furthermore, the fact that the perpetrator is *100 unable to obtain money or other valuables does not preclude the finding of this aggravator. See Bowles v. State, 804 So.2d 1173, 1179 (Fla.2001) (stating that victim's lack of money that defendant could take does not preclude finding of pecuniary gain aggravating circumstance); Shellito v. State, 701 So.2d 837, 842 (Fla.1997) (concluding that pecuniary gain aggravator was properly found where defendant initiated criminal episode to get money or valuables, but shot the victim because the victim had no money).
In the instant case, there is competent, substantial evidence of the pecuniary gain aggravator through witness testimony and Franklin's own statements. Franklin had no money, was running low on gas, and intended to drive back to St. Petersburg from Leesburg on the night of Lawley's shooting. Franklin admitted that he was looking for someone to rob in order to obtain money and a new vehicle. After shooting the victim, Franklin searched the victim's pockets and his car for something of value. Franklin also tried to steal the victim's car, but had to abandon this plan when he was unable to get the victim's car moving. The victim's shooting was not an afterthought of the robbery; there was no apparent motivation for the murder other than taking the victim's property for pecuniary gain.
We find competent, substantial evidence in the record to support both the CCP and pecuniary gain aggravating factors. Thus, we conclude that the trial court did not err in its finding of either aggravating circumstance and Franklin is not entitled to relief on these claims.

Proportionality
Although Franklin has not challenged the proportionality of his death sentence in his appeal to this Court, the State asserts that the death sentence is proportional in this case. This Court has explained that "a proportionality review is inherent in this Court's direct appellate review and the issue is considered regardless of whether it is discussed in the opinion or raised by a party." Patton v. State, 878 So.2d 368, 380 (Fla.2004). Our review involves "a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances." Porter v. State, 564 So.2d 1060, 1064 (Fla.1990); accord Tillman v. State, 591 So.2d 167, 169 (Fla.1991).
The instant case involved a murder to enable robbery of the victim. It also involved four substantial aggravating factors (under imprisonment, prior violent felony convictions, pecuniary gain, and CCP) and slight mitigation. We have found the death sentence to be an appropriate penalty in a number of cases involving similar factual circumstances as well as similar aggravating and mitigating factors. See, e.g., Shellito v. State, 701 So.2d 837, 845 (Fla.1997) (finding death sentence was proportionate for robbery/murder where defendant had been sentenced previously as an adult for a violent felony conviction, was on probation at the time he committed the murder, and had committed three robberies and an aggravated assault on a police officer within days of the murder and only slight weight was given to the mitigating factors of the defendant's age, background, and character); Mendoza v. State, 700 So.2d 670, 679 (Fla.1997) (concluding that death sentence was proportionate for twenty-five-year-old defendant who killed a robbery victim with a single gunshot; court found two aggravating factors of prior violent felony conviction and pecuniary gain and gave little weight to defendant's alleged history of drug use and mental health problems); Pope v. State, 679 So.2d *101 710, 716 (Fla.1996) (finding death sentence proportionate for murder and robbery of neighbor/girlfriend that involved two aggravating factors of pecuniary gain, based upon the defendant's announced intention to kill the victim in order to take her car and money, and his prior violent felony conviction, two statutory mitigating circumstances of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct, and several nonstatutory mitigating circumstances); Melton v. State, 638 So.2d 927, 930-31 (Fla.1994) (finding death sentence was proportionate for fatal shooting of victim during armed robbery of pawn shop; murder involved two aggravating factors of prior violent felony conviction and pecuniary gain and two nonstatutory mitigating factors of the defendant's good conduct in jail and difficult family background). In light of these cases, we conclude that the death sentence imposed in Franklin's case is proportionate.

Ring Claims
Franklin contends that Florida's capital sentencing statute is facially unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He filed pretrial motions raising this claim as well as arguing that Ring requires a statement of particulars as to the aggravating factors and a unanimous jury recommendation as to penalty. At trial, defense counsel also challenged the sufficiency of the indictment charging Franklin with first-degree murder based on the failure to include the aggravating factors in the indictment. Franklin now also claims that judges throughout the state are violating the separation of powers doctrine by "improvising" remedies to the capital sentencing statute's "constitutional infirmities" under Ring.
In over fifty cases since Ring's release, this Court has rejected similar Ring claims. See Marshall v. Crosby, 911 So.2d 1129, 1134 n. 5 (Fla.2005), cert. denied, ___ U.S. ___, 126 S.Ct. 2059, 164 L.Ed.2d 807 (2006). As the Court's plurality opinion in Bottoson v. Moore, 833 So.2d 693 (Fla. 2002), noted, "the United States Supreme Court repeatedly has reviewed and upheld Florida's capital sentencing statute over the past quarter of a century." Id. at 695 & n. 4 (listing as examples Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989), Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984), Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), and Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)). See also King v. Moore, 831 So.2d 143 (Fla.2002) (denying relief under Ring).
Additionally, Ring did not alter the express exemption in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that prior convictions are exempt from the Sixth Amendment requirements announced in the two cases.[10] This Court has repeatedly relied on the presence of the prior violent felony aggravating circumstance in denying Ring claims. See, e.g., Smith v. State, 866 So.2d 51, 68 (Fla.2004) (denying relief on Ring claim and "specifically not[ing] that one of the aggravating factors present in this matter is a prior violent felony conviction"); Davis v. State, 875 So.2d 359, 374 (Fla.2003) (stating that "[w]e have denied relief in direct appeals where there has been a prior violent felony aggravator"); Johnston v. State, 863 So.2d 271, *102 286 (Fla.2003) (stating that the existence of a "prior violent felony conviction alone satisfies constitutional mandates because the conviction was heard by a jury and determined beyond a reasonable doubt"), cert. denied, 541 U.S. 946, 124 S.Ct. 1676, 158 L.Ed.2d 372 (2004); Henry v. State, 862 So.2d 679, 687 (Fla.2003) (stating in postconviction case that this Court has previously rejected Ring claims "in cases involving the aggravating factor of a previous violent felony conviction").
In the instant case, the trial court found the aggravating circumstance of a prior violent felony conviction, based on Franklin's convictions for the 1993 robbery of Martin, the December 2001 murder, kidnapping, and armed robbery of Horan, and the December 2001 burglary, robbery with a deadly weapon, and attempted felony murder of Johnson. Additionally, we have rejected similar claims that Ring requires aggravating circumstances to be alleged in the indictment or to be individually found by a unanimous jury verdict. See Hodges v. State, 885 So.2d 338, 359 nn. 9-10 (Fla. 2004); Blackwelder v. State, 851 So.2d 650, 654 (Fla.2003); Porter v. Crosby, 840 So.2d 981, 986 (Fla.2003).
Finally, we note that the trial court, at Franklin's request, gave the jury a special interrogatory verdict form regarding the aggravating factors. The jury unanimously found the four aggravating factors that the trial judge subsequently found applicable in Franklin's case. We recently held that "a trial court departs from the essential requirements of law in a death penalty case by using a penalty phase special verdict form that details the jurors' determination concerning aggravating factors found by the jury." State v. Steele, 921 So.2d 538, 548 (Fla.2005). We reached this conclusion because such a penalty phase special verdict form imposes a substantive burden on the State that is not found in the Florida statute and not constitutionally required. Id. at 546. However, even without this additional burden, requiring "specific jury findings on aggravators without guidance about their effect on the imposition of a sentence could unduly influence the trial court's own determination of how to sentence the defendant," thereby harming the trial court's independent determination of the existence of the aggravating and mitigating circumstances and the weight to be given each. Id. We further explained that the requirement of a majority vote on each aggravator is "an unnecessary expansion of Ring" and "creates a potential inconsistency in capital sentencing proceedings" in different courts. Id. at 546-47.
However, in light of Franklin's request for the special verdict form and the State's agreement to its use, the unanimous jury finding as to the four aggravating circumstances, and the jury's unanimous recommendation of a death sentence, we find no reversible error on this point. Thus, Franklin is not entitled to relief on any of his Ring claims.

Conclusion
For the reasons stated above, we find no merit to most of Franklin's claims of error. In those instances where error did occur, we conclude that the error was harmless beyond a reasonable doubt. Accordingly, we affirm Franklin's conviction of first-degree murder and his sentence of death.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which ANSTEAD, J., concurs.
CANTERO, J., concurs with an opinion, in which WELLS and BELL, JJ., concur.
*103 PARIENTE, J., specially concurring.
I concur in the majority opinion but write separately to comment, as I have in other cases, on the trial court's use of a penalty-phase special verdict to record the jury's vote on the aggravating circumstances. See Coday v. State, 946 So.2d 988, 1023-24 (Fla.2006) (Pariente, J., concurring in part and dissenting in part); Huggins v. State, 889 So.2d 743, 776-77 (Fla.2004) (Pariente, C.J., dissenting). I also write to urge the Court to consider penalty-phase instructions that will clearly explain that the jurors are the finders of fact as to aggravating circumstances, and standard verdict forms that will require jurors to record their vote as to each aggravating circumstance found, separate from their vote on the penalty recommendation. In writing this, I acknowledge that special verdict forms indicating aggravating factors found by the jury are not required as a result of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). See Kormondy v. State, 845 So.2d 41, 54 (Fla.2003). However, that does not preclude the Court from adopting rules that would require their consistent use in death penalty-sentencing proceedings.
The special verdict form used by the trial judge in this case could be a model for all death penalty cases. As used by many other excellent trial judges after Ring, and before State v. Steele, 921 So.2d 538 (Fla.2005), these "special verdict forms specifying each aggravating circumstance found by the jury will assist the trial court in determining whether to impose the death penalty, and will also facilitate review by the appellate court, especially in a harmless error analysis." Globe v. State, 877 So.2d 663, 680 (Fla.2004) (Pariente, J., specially concurring). In this case, the jury's unanimity in finding the existence of four aggravators supported the trial court's decision to impose death based on the same four aggravators. Further, the majority points to the unanimous jury findings in rejecting a challenge to several aggravators in this case, as well as in Hoskins v. State, 965 So.2d 1, 16, 2007 WL 1147291 (Fla. Apr. 19, 2007). Finally, when it reflects a unanimous vote on the aggravators, as in this case, the verdict form forecloses a subsequent claim of constitutional infirmity under Ring.
I acknowledge that this Court determined in 2005 that an order authorizing a special verdict that would require jurors to agree that a particular aggravator applies before they can weigh it in favor of a death recommendation departed from the essential requirements of law. See Steele, 921 So.2d at 540. The Steele majority stated:
Under the law, . . . the jury may recommend a sentence of death so long as a majority concludes that at least one aggravating circumstance exists. Nothing in the statute, the standard jury instructions, or the standard verdict form, however, requires a majority of the jury to agree on which aggravating circumstances exist. Under the current law, for example, the jury may recommend a sentence of death where four jurors believe that only the "avoiding a lawful arrest" aggravator applies, see § 921.141(5)(e), while three others believe that only the "committed for pecuniary gain" aggravator applies, see § 921.141(5)(f), because seven jurors believe that at least one aggravator applies. The order in this case, however, requires a majority vote for at least one particular aggravator. This requirement imposes on the capital sentencing process an extra statutory requirement.

Id. at 545 (latter emphasis supplied). The Steele majority, also concerned about ad hoc innovations in Florida's capital sentencing *104 procedures, stated that guidelines for individual jury findings on aggravating circumstances and accompanying jury instructions "are more appropriately crafted in a rules proceeding than in an individual capital case." Id. at 546. Accordingly, the majority concluded that "unless and until a material change occurs in section 921.141, the decisional law, the applicable rules of procedure, or the standard instructions and verdict form," verdict forms detailing the jurors' votes on specific aggravating circumstances are impermissible. Id. at 547-48.
The material change anticipated in Steele has not occurred, via either statutory revision as the Steele majority recommended or an interrogatory verdict form on aggravating circumstances and accompanying amendment of the standard jury instructions. While we must leave statutory revision to the Legislature, we have the authority to revise the standard penalty-phase verdict form and jury instructions in a manner consistent with our death penalty statute. In Globe, joined by Justice Anstead and Justice Lewis, I recommended that the Committee on Standard Jury Instructions in Criminal Cases and the Criminal Court Steering Committee "study the matter and propose changes to the verdict form and instructions on the jury's role in the penalty phase that this Court can then consider and either reject, accept or modify." 877 So.2d at 680 (Pariente, J., specially concurring).
In a report submitted after Globe and before Steele, the Steering Committee proposed a verdict form and instructions calling upon jurors to record their findings and vote breakdown on the existence of aggravating and mitigating circumstances. Significantly, the Steering Committee suggested that the special verdict could be used under the present statutory scheme. See Amended Report-Standard Instructions in the Penalty Phase of Capital Trials 2, 4, & App. 3-3A, In re Standard Jury Instructions in Criminal Cases  Penalty Phase of Capital Trials, No. SC05-1890 (Fla. Oct. 5, 2005). As explained by the Committee:
Presently, the trial judge does not know how the jury considered the various aggravating and mitigating circumstances submitted. The fact that jurors do not have to reach unanimity on aggravating or mitigating circumstances adds confusion to the problem. It would be most helpful for the trial judge to know how the jury viewed the evidence presented in the penalty phase  particularly how many jurors agreed to the existence of each aggravating and mitigating circumstance  before preparing the sentencing order. The information would provide valuable assistance in deciding the weight to be given to each circumstance.
However, the Steering Committee withdrew its proposal, concluding that the Court in Steele "held this suggestion to be a substantive change and rejected it." Response of the Criminal Court Steering Committee 6-7, In re Standard Jury Instructions in Criminal Cases  Penalty Phase of Capital Trials, No. SC05-1890 (Fla. Feb. 14, 2006).
I disagree that a recorded jury vote on individual aggravators necessarily imposes a substantive burden on the State beyond what is required by our capital sentencing law. Jurors given an interrogatory on individual aggravators could be told that to recommend death, a majority must find that at least one aggravator exists but need not reach a majority on any single aggravator.[11] That is all the majority of *105 this Court believes that our present death penalty law requires. See Steele, 921 So.2d at 545.
More than four years ago, in Bottoson v. Moore, 833 So.2d 693 (Fla.2002), we first addressed the effect of Ring on Florida's capital sentencing statute. Although I concurred in the result in that case, a denial of relief on a successive postconviction habeas petition, I recommended two steps that could be taken without contravening Florida's death penalty scheme. First, I stated that "jurors [should be] told that they are the finders of fact as to the aggravating circumstances." Second, I stated that trial courts should be required to "utilize special verdicts that require the jury to indicate what aggravators the jury has found and the jury vote as to each aggravator." Bottoson, 833 So.2d at 723 (Pariente, J., concurring in result only). In their separate opinions in Bottoson, Justice Anstead and Justice Quince also recognized that special verdicts should be considered after Ring. See id. at 708 (Anstead, C.J., concurring in result only) (stating that under the bare advisory recommendation required of juries under the current standard instructions, "there could hardly be any meaningful appellate review" because "it would be impossible to tell which, if any, aggravating circumstances a jury or any individual juror may have determined existed"); id. at 702 (Quince, J., specially concurring) (stating that "it may be a good idea to give the jury special interrogatories at the penalty phase").
That was 2002. It is now 2007, and we still have not amended the standard instructions and penalty-phase verdict form to reflect jury findings on aggravators that operate as "the functional equivalent of an element of a greater offense." Ring, 536 U.S. at 609, 122 S.Ct. 2428 (quoting Apprendi v. New Jersey, 530 U.S. 466, 494 n. 19, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)). Steele leaves open the possibility of recorded jury votes on individual aggravators if jurors are appropriately instructed. The majority's reference to the vote on these verdicts in addressing challenges to several aggravators in this case and Hoskins illustrates their usefulness. I therefore urge my colleagues to consider the proposal previously submitted by the Criminal Court Steering Committee, including a penalty-phase special verdict and accompanying instructions crafted to avoid the conflict with the substantive law identified in Steele.
ANSTEAD, J., concurs.
CANTERO, J., concurring.
Like the majority, I would affirm Franklin's conviction for first-degree murder and his sentence of death. I agree with the majority that Franklin's general hearsay objection at trial did not preserve his Confrontation Clause argument with regard to Lawley's statements to Ellis and Officer Iozzi. I write separately to suggest this Court adopt a "primary purpose" test for determining whether hearsay statements are testimonial.

TEST FOR TESTIMONIAL STATEMENTS
Because the majority held that Franklin's Confrontation Clause argument with regard to Lawley's statements was not preserved, its discussion of the proper test for determining whether hearsay statements *106 are testimonial is dictum. Nevertheless, I write separately to address the test I believe we should employ in determining whether hearsay statements are testimonial. As the majority notes, in Crawford the Supreme Court mentioned (but did not adopt) a three-factor approach for determining whether hearsay statements are testimonial:
[T]he Supreme Court discussed three formulations of statements that might qualify as testimonial, namely: (1) "ex parte in-court testimony or its functional equivalent  that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; or (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."
Majority op. at 90 (quoting Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354).
In the passage the majority cites, the United States Supreme Court quoted from the petitioner's brief in Crawford and the brief of the National Association of Criminal Defense Lawyers, as amicus curiae. Later in the opinion, the Court specifically declined to adopt any particular definition of "testimonial," leaving that issue "for another day." 541 U.S. at 68, 124 S.Ct. 1354. Therefore, far from adopting the three-part definition, the Court expressly declined to adopt one.
The United States Supreme Court came closer to defining what is testimonial in Davis v. Washington, ___ U.S. ___, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and its companion case Hammon v. State. In Davis and Hammon, the Court focused on the "primary purpose" of a declarant's statements:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Id. at 2273-74 (emphasis added).
Although the holding in Davis was limited to situations involving police interrogation, the Court contemplated a broader application: "Our holding refers to interrogations because . . . the statements in the cases presently before us are the products of interrogations  which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. . . . and of course even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." Id. at 2274 n. 1 (emphasis added).
The majority notes that "Davis left open the question of `whether and when statements made to someone other than law enforcement personnel are "testimonial."'" Majority op. at 91. I agree that the holding in Davis does not by its terms apply to such cases. However, I believe Davis does provide compelling guidance. I would therefore adopt a comprehensive primary purpose test similar to that the Nevada Supreme Court recently outlined *107 in Harkins v. State, 143 P.3d 706 (Nev. 2006). Harkins articulated a "totality of the circumstances" approach for determining whether a hearsay statement is testimonial:
Together, Crawford, Davis, and Hammon demonstrate that when determining whether a statement is testimonial, it is necessary to look at the totality of the circumstances surrounding the statement. . . .
. . . .
. . . We now take the opportunity to further refine this rule by presenting a nonexhaustive list of factors for courts to consider in determining whether a statement is testimonial: (1) to whom the statement was made, a government agent or an acquaintance; (2) whether the statement was spontaneous, or made in response to a question (e.g., whether the statement was the product of police interrogation); (3) whether the inquiry eliciting the statement was for the purpose of gathering evidence for possible use at a later trial, or whether it was to provide assistance in an emergency; and (4) whether the statement was made while an emergency was ongoing, or whether it was a recount of past events made in a more formal setting sometime after the exigency had ended. . . . These factors will assist courts in ascertaining the relevant facts surrounding the circumstances of a hearsay statement in order to determine its testimonial nature.
Id. at 714. The Nevada Supreme Court's nonexhaustive four-factor test focuses on one pivotal issue: objectively determining the primary purpose of a hearsay statement. The fundamental question is whether the totality of the circumstances indicates that the primary purpose of the statement was to establish past events for later use in a criminal prosecution.
Several state courts have discussed a similar approach. See Raile v. People, 148 P.3d 126 (Colo.2006) ("To determine the nature of hearsay statements, the context and circumstances under which the statements are made are highly relevant.") (citing Davis, 126 S.Ct. at 2273-74); State v. Kirby, 280 Conn. 361, 908 A.2d 506, 522 (2006) ("The Court used its `primary purpose' test to hold that these statements were testimonial. . . ."); State v. Justus, 205 S.W.3d 872, 880 (Mo.2006) (holding that statements by a child molestation victim to sex abuse counselors were testimonial because the counselors, although not government employees, were government agents, and "the circumstances indicate that their primary purpose was to establish or prove past events potentially relevant to later criminal prosecution"); State v. Blue, 717 N.W.2d 558, 563 (N.D.2006) ("Even before Davis, the cases that interpreted Crawford noted the context and circumstances in which a statement is made is important in determining whether a statement is testimonial."); State v. Mechling, 219 W.Va. 366, 633 S.E.2d 311, 321 (2006) ("The guidelines adopted by the Court in Davis are flexible and inherently fact-based, and the existence or lack of government interrogation does not necessarily determine whether a statement is testimonial"); see also United States v. Ellis, 460 F.3d 920 (7th Cir.2006) (holding that testimony by medical technicians, introducing medical records into evidence which proved the defendant had consumed methamphetamine, were not testimonial because "the objective circumstances . . . indicate that their observations and statements . . . were made in nothing but the ordinary course of business").
I would adopt the emerging "primary purpose" approach espoused in Davis. As to many of the statements at issue, the majority appears to use precisely *108 such an analysis. For example, the majority applies the Davis primary purpose test to conclude that the victim's statements to the responding officer were not testimonial. Majority op. at 93. I agree with that analysis. As to the statements the victim made to Ellis just after he was shot, the majority does "consider the circumstances surrounding Lawley's statements." Majority op. at 91. However, the majority does not specifically employ the primary purpose test  presumably because the statements were not made to law enforcement officers. Although Davis and Hammon involved statements to law enforcement, as I noted above, the primary purpose test the Court adopted is not necessarily limited to that context. Therefore, I would apply that test and hold that the victim's primary purpose was, as the majority itself notes, "to summon assistance and to relay to his friend what had happened to him." Majority op. at 91. Because the primary purpose of the statements was not "to establish or prove past events potentially relevant to later criminal prosecution," Davis, 126 S.Ct. at 2274, they were not testimonial.
Except for these comments, I join the majority opinion.
WELLS and BELL, JJ., concur.
NOTES
[1] Franklin pled guilty to first-degree murder, kidnapping, and armed robbery in Horan's shooting. He was sentenced to three consecutive life sentences.
[2] In the middle of trial for the attack on Johnson, Franklin accepted a plea bargain. Franklin pled guilty to burglary, robbery with a deadly weapon, and attempted felony murder and was sentenced to life imprisonment.
[3] The record is silent as to how long it took Officer Iozzi to arrive at the scene.
[4] The trial court found ten nonstatutory mitigating factors: (1) there were deficiencies in Franklin's upbringing which included being forcibly removed by his biological mother from the only mother and father he had known for eight years (given some weight); (2) Franklin had been sentenced to adult prison at a young age and served eight years of a ten-year sentence, which was a severe sentence in light of his prior record (given little weight); (3) Franklin had cooperated with law enforcement after his arrest (given some weight); (4) Franklin took responsibility for his crimes by confessing to the police and a newspaper reporter (given some weight); (5) Franklin had offered to plead guilty in return for a life sentence without possibility of parole that would run consecutive to his other life sentences (given little weight); (6) Franklin apologized to the victim's family, showed remorse, and confessed to other offenses which were used as aggravating circumstances (given some weight); (7) Franklin apologized and showed remorse for his other crimes (given little weight); (8) Franklin had entered pleas in his related cases and had been sentenced to life (given some weight); (9) there was no one available to testify on Franklin's behalf in the penalty phase (given some weight); and (10) codefendant McCoy received a thirty-five-year sentence for her role in the crimes (given little weight).
[5] The Confrontation Clause of the Sixth Amendment provides that in all criminal prosecutions the accused has the right "to be confronted with the witnesses against him." U.S. Const. amend. VI.
[6] Section 921.141(1), which governs the penalty phase proceedings that are held after a defendant is adjudicated guilty of a capital felony, provides in pertinent part that evidence "relevant to the nature of the crime and the character of the defendant," including "matters relating to any of the aggravating or mitigating circumstances enumerated [in the statute]" is admissible "regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements."
[7] However, as noted above, this issue was not preserved by a proper objection. Thus, the merits of this claim are not before this Court.
[8] In full, the three statements that Franklin wanted redacted from the tape and that the jury heard during the guilt phase of trial provided:

Reporter: Why have you decided to confess now?
Franklin: I'm tired of life, man. I'm tired of being  I'm tired of being treated just like an animal.
. . . .
Reporter: What else do you remember from that night?
Franklin: Uh, man, we just left, man. Just  just left from there, you know? Saw a helicopter in the looking  looking for the car we was in, and we was hiding, and then we left.
Reporter: Uh-huh.
Franklin: We left to St. Pete.
. . . .
Reporter: So now  so now what? I mean, you're back here. What's gonna happen?
Franklin: I don't know. I don't care. You know what I mean? Whatever happens, you know, happens. I'm just saying, you know. I did it. You know, I did my part, you know? I ain't denying it no more, and that's it, and everybody out there want to look at me and find me guilty anyway. I did it, but, so what, you know? They the cause of that there. The people, the world, the world, life, life itself. It's  I hate  I hate living. I just hate life. I mean, I'm tired of  I'm tired of everything. I'm tired of people watching me, tired of people hating me, you know what I mean? I'm tired of people. You know what I mean? Things people do, you know? I'm tired of everything.
[9] In fact, the only indication on the record of an emotional display is a bench conference in which the judge noted that Franklin seemed to be "acting up" during the testimony by the elderly victim Johnson. The judge called a brief recess so that defense counsel could calm his client.
[10] In Apprendi, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added).
[11] I believe that the jury-trial guarantee in article I, section 22 of the Florida Constitution together with the logical application of Ring requires that a jury finding that at least one aggravator exists must be unanimous, but that is not the majority view in this Court. See Butler v. State, 842 So.2d 817, 838 (Fla. 2003) (Pariente, J., concurring in part and dissenting in part).