# Supreme Court of Florida

———————

No. SC2022-0745

———————

**EVERETT G. MILLER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

February 29, 2024

PER CURIAM.

Everett Glenn Miller appeals his convictions and death sentences for the first-degree premeditated murders of Kissimmee Police Officers Matthew Baxter and Richard "Sam" Howard, both of whom were shot twice in the head from close range in 2017. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. For the reasons we explain, we affirm Miller's convictions and death sentences.[1]

---

1. Miller does not appeal his separate convictions and sentences for one count of resisting a law enforcement officer without violence, and one count of carrying a concealed firearm in an establishment licensed to dispense alcohol.

# I. BACKGROUND

On August 18, 2017, at approximately 9:30 p.m., Miller pulled his car over and angrily inserted himself into a conversation Officer Baxter was having with three individuals who were loitering on a street corner. At Miller's request, Officer Baxter called his supervisor to the scene. After the supervisor—Sergeant Howard—arrived, Miller made certain comments that caused Sergeant Howard to instruct the three loiterers to leave the area. Soon thereafter, both Officers had been twice shot in the head. When Miller was arrested in Roscoe's, a local bar later that night, he was carrying two firearms, including the murder weapon—a small .22 caliber revolver capable of being concealed in the palm.

Before the murders, Miller, a former Marine, had been making hateful anti-police and race-based social media posts, including this post just hours earlier: "Am I the only one. Fuck a Cop . . . Racist Fuckers."

At trial, Miller did not dispute that he killed both Officers. The defense instead argued that premeditation was lacking, and that Miller committed second-degree murder. The jury ultimately convicted Miller of two counts of first-degree premeditated murder

and later unanimously recommended death for each murder.

## Guilt Phase

The State presented the testimony of numerous witnesses, including one of the three loiterers, various law enforcement officials, a jailhouse informant, medical examiners, and employees of Roscoe's. The State also introduced, among other things, forensic evidence, a video taken by one of the loiterers showing some of Miller's interaction with Officer Baxter, and Miller's social media posts expressing animus against the police. The evidence established the following.

On the night of the murders—at the location where the murders were to occur—Officer Baxter approached Maribel Gonzalez King, who had an open beer container, and her two friends (nicknamed "Dash" and "Blaze") who were all loitering on a street corner in Kissimmee. King knew Officer Baxter (and Sergeant Howard) from previous interactions. Officer Baxter was in full police uniform, had a marked car, and was, according to King, "calm and relaxed, like normal."

During Officer Baxter's interaction with the three individuals, Miller pulled up in his vehicle, stopped suddenly, got out, and

walked toward Officer Baxter. After an obnoxiously loud Miller told Officer Baxter to stop harassing people and requested that Officer Baxter call his superior, Officer Baxter radioed his location and that a black male wanted to speak to Sergeant Howard. Within minutes, Sergeant Howard arrived in a marked car and full police uniform and, according to King, "stayed calm the whole time." Neither Officer acted aggressively, threatened to use a weapon, or gave any commands to Miller.

Sergeant Howard's demeanor changed after Miller commented that he feared for his life and was eligible to carry a concealed weapon. Upon hearing those words, Sergeant Howard instructed King and her friends to move along. King, the last to walk away, made it only halfway down the street when she heard two gunshots, a pause, and two more gunshots. After hearing a car speed away, King looked back and saw two officers on the ground.

A woman who lived close to the murders also heard noises—interrupted by a pause—that sounded like possible gunshots. She looked outside her house and saw two police vehicles and a dark vehicle. After seeing an individual speed away in the dark vehicle, she saw two officers on the ground and called 911.

The first officers to arrive at the scene, Lieutenant Christopher Paul Succi and Officer David Toro, noticed the bodies were unusually situated. That is, Officer Baxter and Sergeant Howard—each with a fully loaded pistol still securely holstered and an undeployed taser—were "both on their backs, feet straight, arms to the side," and were "laying parallel next to each other, a few feet apart." In other words, their bodies had been positioned.

Sergeant Howard had no defensive wounds, a "near contact" gunshot wound on the left side of his head in the temporal region, and a "near contact or intermediate" gunshot wound just above the upper lip. Officer Baxter had some abrasions that were consistent with a fight or altercation but also consistent with simply falling and being scraped on the pavement. Officer Baxter also had two gunshot wounds to the head—one through the lower lip, the other to the back left side of the head—both of which were "contact wounds." The four bullets were ultimately recovered during the Officers' autopsies.

Later the night of the shootings, the lead investigator, Corporal Charles Hess, became aware that Dash had provided to law enforcement a brief video he had taken of Officer Baxter's

interaction with the black male. After an investigator recognized Miller in the video, a bulletin was put out, and the video was sent to the field units.

In the meantime, Miller abandoned his vehicle in a woman's yard and eventually made his way to Roscoe's. Upon entering Roscoe's, Miller—an unfamiliar face—commented that "there was some crazy stuff going on outside" and that he "was gonna stay and have a drink." Miller proceeded to the bar area, where he was calm and coherent until a patron approached and asked if Miller had shot two cops. Miller became agitated, denied shooting any officers, and claimed he had been there at Roscoe's. Another patron overheard Miller say at one point that the Officers "got what they deserved."

Miller's behavior at Roscoe's soon led to his arrest. After the owner of Roscoe's contacted law enforcement about an agitated person and provided a description matching the individual in Dash's video, multiple deputies entered Roscoe's and arrested Miller, who was carrying a black 9mm Sig Sauer, a knife, and a

small .22 caliber "single action" revolver.[2]  The .22 revolver—which was found in Miller's front pocket, holds five rounds, and does not eject shell casings—had one live round and four that had been fired.  Firearms testing later confirmed that the four bullets recovered during the Officers' autopsies were fired from Miller's revolver.

After Miller's arrest, law enforcement located his dark blue Kia Optima.  Among other things, a latent print was discovered on the trunk lid, and bloodstains were found on a rear tire.  Fingerprint analysis and DNA testing matched the print and blood to Sergeant Howard.  Other items sent for DNA testing—including physical samples collected from Miller, and a hat and necklace recovered at the crime scene—also tied Miller to the murders.

Within days of the murders, Corporal Hess discovered Miller had a YouTube channel for firearms instruction and review.  One video showed Miller using a single-action .22 caliber revolver to rapidly fire successive bullets into a target's head from

---

2.  As explained at trial, "single action" means that an individual must perform two actions to fire the gun, namely pulling back the hammer and then pulling the trigger.

approximately ten yards.

Corporal Hess also discovered Miller had been making anti-law-enforcement posts on a Facebook page under the profile name of Malik Mohammad Ali. For example, on August 12, 2017, Miller posted comments including this one: "Punk AssBlack Cop. Here is a real nigger! I would love to meet him." That same day, Miller also posted a picture of a law enforcement officer, with certain captions including "There Are No 'Good Cops.'" And as previously mentioned, on August 18, 2017, hours before the murders, Miller posted: "Am I the only one. Fuck a Cop . . . Racist Fuckers."

Lastly, Corporal Hess became aware that a jailhouse informant came forward about conversations with Miller regarding the murders. At trial, the informant testified that, among other things, Miller used the Officers' names as though he knew them, said he "hated them" for always harassing people, and talked about what he would have done if he had his AR-15.

The defense called one witness, Miller's half-sister, who testified that Miller was loving and caring, and that before the murders, he lost his job working for Sonoco, had a breakup with his girlfriend, showered less, became jumpy, and started acting like

- 8 -

somebody was watching him. She also testified that a few weeks before Miller's arrest, she drove him to the police station; he was crying and chanting his military ID number.

After hearing all the evidence, the jury unanimously convicted Miller of two counts of first-degree premeditated murder.

## Penalty Phase

In the penalty phase, the State presented additional witnesses and evidence, including additional Facebook posts by Miller.

The State's first witness, Julian Albright, who met Miller on active duty and later worked with Miller for a military contractor before Miller left that job in 2016, testified about a daytime meetup he agreed to have with Miller at a 7-Eleven a month or two before the murders. When Albright arrived at the 7-Eleven, he saw plainly visible bags of marijuana in Miller's backseat. Miller was unconcerned about the drugs and at one point showed Albright a very small .22-caliber-looking firearm while saying: "I'm not gonna be another statistic. I'm not gonna be caught driving while black, you know. . . . [I]f you're gonna take me out, you know, I've got this." Miller also showed Albright a 9mm firearm and an AR-15.

The State then called its anti-government extremism expert,

J.J. MacNab, a research fellow at George Washington University's program on extremism. The State originally planned to call MacNab during the guilt phase to opine that Miller had become a radicalized Moorish sovereign and to explain how she reached that conclusion based on the materials she examined. But after MacNab's testimony was proffered and a *Daubert*[3] hearing was held, the parties called what the judge described as "an armistice on the Moorish issue," at least for the guilt phase. After the hearing, the court issued an order qualifying MacNab as an expert to testify about "the Moorish Sovereign Citizen Movement, including its ideology and underlying customs, symbols and beliefs." But the court limited the scope of her testimony because of concerns about "the danger of allowing her to testify to everything proffered." And the court limited her to "expository testimony only."

During MacNab's limited penalty phase testimony, she described the Moorish belief system, including that it is primarily a Muslim group not recognized by standard Muslims, has an alternative view of history, is non-violent, and is harmless at its

---

3. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

core.  She then described how the white-supremacy-based sovereign citizen movement influenced a pocket of Moorish believers.  She explained that Moorish sovereigns are "highly distrustful of government," tend to be "anti-white," and do not have a positive view of law enforcement.  She also testified about an uptick in Moorish sovereign violence after the 2014 events in Ferguson, Missouri, and gave examples of Moorish sovereign violence against law enforcement, mostly in 2016 and 2017.

Following MacNab's testimony, seven additional Facebook posts by Miller were published to the jury.  In the posts, all but one of which were made on the day of or within days before the murders, Miller expressed animus against white people, indicated he identified as a Moor, or suggested an alternative view of history.  And in a post from a year before the murders, Miller shared a meme of someone repeating themes and theories of sovereign citizens.

The State then presented victim impact statements before resting its case.  The State also had victim impact videos but was unable to play them before resting; the State needed time to edit the videos in response to a last-minute defense objection and had been granted permission by the court to play the videos during rebuttal.

After the State rested, the defense called numerous witnesses, including Albright. Several of the witnesses knew Miller from his time as a Marine or his work for a military contractor. According to those witnesses, Miller was a very good Marine and person, was an imaging analyst before later becoming a targeteer, was involved in targeting strikes into Afghanistan where innocent people were occasionally killed, and had been deployed a few times, including to Afghanistan in 2013. One witness testified Miller had problems sleeping while in Afghanistan and, upon returning, occasionally had nightmares. Another witness acknowledged Miller's military records included a court martial from 1992 in which one of the charges was assault by waving a dangerous weapon. And one witness testified that Miller's decision to leave military contracting was primarily a financial one.

Some of Miller's family members testified about his happy childhood and how his demeanor changed after leaving the military. Miller's cousin, for example, testified that Miller became depressed and remorseful, was in a downward spiral, tried to get help from Veterans Affairs (VA), and was committed under the Baker Act due to an incident in which he was running around town in his

underwear. And Miller's daughter testified he seemed to be suffering and was more paranoid.

Miller's father testified to being a Jehovah's Witness and taking Miller to Kingdom Hall every week when Miller was growing up, to having a brother who had post-traumatic stress disorder (PTSD), and to divorcing Miller's mother, marrying his current wife, and being given custody of and raising Miller. Miller eventually went to live with his mother, who was not a Jehovah's Witness and was more likely to allow him to play high school sports. Miller later signed up for the Marines, married, had a daughter, divorced, and, after leaving military contracting, worked with his father at Sonoco before being laid off and living house to house.

Dr. Steven Gold, a psychologist and professor, opined that Miller met the diagnostic criteria for PTSD and two statutory mitigators, namely that Miller was under the influence of extreme mental or emotional disturbance at the time of the crimes, and that Miller's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. *See* § 921.141(7)(b), (f), Fla. Stat. Dr. Gold further opined that something likely triggered Miller's PTSD on the night of

the murders and that Miller was weighed down by stressful circumstances, including that he had been subjected to fire while deployed, and was involved in strikes that resulted in civilian deaths. At one point, after being asked by defense counsel about Miller's Facebook posts, Dr. Gold noted that the posts expressed hateful anger towards white people and that anger can be a symptom of PTSD.

Dr. Gold was not the only defense witness asked by defense counsel about Miller's anti-white posts or whether Miller was a racist. Indeed, at one point during a sidebar, the trial judge commented that the defense had "repeatedly brought up, through every single witness, the racism issue."

When the defense's final witness was temporarily unavailable, the State began calling rebuttal witnesses, including two who provided additional context regarding Miller's Baker Act incident. One testified that Miller described the incident as follows: Miller had a disagreement with his uncle and stripped down to prove he was unarmed; on Miller's way back to his car, a man flashed a gun at Miller, who then went to retrieve his AR-15; when Miller was told the police were coming, he ditched the AR-15 in the woods and later

asked someone to retrieve and hide it in Miller's trunk.

After the State's initial rebuttal witnesses, the court recessed for a long weekend. When the proceedings resumed, the victim impact videos were played first thing, with limiting instructions given before and after the videos were played.

The defense then called its final witness, Dr. Robert Cohen, a behavioral health officer and neuropsychologist. Dr. Cohen opined that Miller was likely suffering from PTSD at the time of the murders, was under the influence of extreme mental or emotional "disorder," and had cumulative trauma stemming from deployments and a hospital bombing.

The State then called its remaining two rebuttal witnesses. One testified regarding the incident that led to Miller's court martial. The other, Dr. Michael Gamache, a psychologist, rebutted the defense experts' conclusions that Miller suffered from PTSD. Dr. Gamache also opined that the evidence was insufficient to support "extreme mental disorder or extreme mental illness" at the time of the crimes. According to Dr. Gamache, four factors affected Miller's conduct in the summer of 2017: alcohol, cannabis, adjustment disorder (from stress), and ego (adjustment to post-

- 15 -

military life).

The jury unanimously recommended death sentences for each murder, finding beyond a reasonable doubt the existence of all four proposed aggravators, namely: (1) the victim was a law enforcement officer engaged in the performance of his official duties; (2) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to another person (based on the contemporaneous murders of Officer Baxter and Sergeant Howard); (3) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP); and (4) the capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws. Each juror also found that no mitigating circumstance was established.

### *Spencer*[4] **Hearing**

At the *Spencer* hearing, the State presented additional victim impact testimony before the defense called a handful of witnesses.

One defense witness testified regarding the events that led to

---

4. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

Miller's court martial, including that he was with Miller and never saw Miller with a gun. And two witnesses testified Miller received the least amount of punishment possible in a court martial proceeding.

Another witness, Adam Thomas, who was twice deployed to Iraq with Miller, explained what imagery analysis entails and testified regarding the lasting impact (upon Thomas) of the threats of indirect fire attacks they received while deployed. After returning from Iraq, Thomas noticed things about Miller that were out of character, including Miller's extreme Facebook posts.

Dr. Elizabeth McAlister, who teaches Africana religions at Wesleyan University, opined that Miller did not like participating as a Jehovah's Witness when growing up and was spiritual but not religious. She also testified that in the summer of 2017, Miller became interested in Moorish Science and tracing his heritage. She acknowledged the increase in sovereign Moors but opined that Miller was a normative Moor—as distinct from Moors influenced by sovereign citizens—although she conceded there is racial animus within the Moorish sovereign group and that Miller's social media posts were out of character for a normative Moor.

**Sentencing**

The trial court agreed with the jury regarding the four aggravators. The court merged them to three, as follows: (1) prior capital felony or felony involving the use or threat of violence to another person (based on the contemporaneous murders); (2A) the capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws, merged with (2B) the victim was a law enforcement officer engaged in the performance of his official duties; and (3) CCP. The court assigned each aggravator very great weight.

Regarding mitigation, the court explained that Miller "offered three statutory . . . mitigating circumstances" as well as thirty-three proposed other factors in Miller's background that would mitigate against imposition of the death penalty under section 921.141(7)(h), Florida Statutes. The court found that one "statutory" mitigator had been proven, namely no significant history of prior criminal activity (moderate weight).[5] As to the remaining proposed

---

5. The court concluded that Miller failed to establish two other statutory mitigators, namely that he was under the influence of extreme mental or emotional disturbance, and that his capacity

mitigation, which Miller grouped into seven "categories," the court found that the mitigation was generally established and assigned it varying weight.[6]

In the end, the court imposed a sentence of death for each murder after concluding "that the aggravating factors far outweigh[ed] the mitigating circumstances and support[ed] the recommendations of the jury for a sentence of death as to [each murder]." The court further found that "any of the considered aggravating factors found in this case, standing alone, would be sufficient to outweigh the mitigation in total." This appeal followed.

## II.  ANALYSIS

Miller raises seven issues in this appeal. We also

---

to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

6.  Specifically, the court found as follows regarding the remaining proposed mitigation: (1) Miller's service to his country/United States Marine Corps and contracting (considerable weight); (2) Miller's service-related traumatic experiences (little weight); (3) Miller's downward spiral into mania and madness (little weight); (4) statutory mental health mitigators (previously discussed); (5) Miller's mental and physical health symptoms and diagnosis (some weight); (6) Miller's family life and relationships (very little to no weight); and (7) good citizen; service to the community (little weight).

independently review whether the evidence was sufficient to support the murder convictions.

## Race, Religion, and Political Beliefs

Miller first argues that, although evidence of his animus against law enforcement was admissible, the State crossed the line in the penalty phase by introducing his anti-white and pro-Moor Facebook posts and the testimony of MacNab, the State's expert who provided expository testimony regarding Moorish sovereigns. Miller asserts the State was erroneously permitted "to inject race, politics and religion into th[e] case," thereby denying him a fair penalty phase. He argues the testimony and additional Facebook posts were not relevant—in part because neither victim was white— and in any event unfairly prejudicial. *See* § 90.403, Fla. Stat. ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").

At the outset, we note that the arguments Miller presents are not entirely consistent with those he presented (or failed to present) below. As an example, Miller argues relevance and unfair prejudice with respect to MacNab's testimony and the additional posts, but the defense below effectively conceded the relevance of the posts.

That is, shortly before MacNab testified, the defense objected to the posts on relevance grounds before conceding they "would become relevant" if the State "put Ms. MacNab on first," which is precisely what the State did. The defense then stated its objection was on prejudice grounds.

To the extent Miller's arguments have not been waived, we review this issue for abuse of discretion. *See Hudson v. State*, 992 So. 2d 96, 107 (Fla. 2008) ("We review a trial court's decision to admit evidence under an abuse of discretion standard."). We recognize that evidence of religious or political beliefs or of racial slurs can be unfairly prejudicial, particularly in a penalty phase. But here, we conclude the trial court did not abuse its discretion in permitting the State to present MacNab's testimony and the additional posts, the probative value of which related to the State attempting to establish an all-encompassing motive for the murders and was not "substantially outweighed by the danger of unfair prejudice." § 90.403, Fla. Stat. Even assuming an error occurred, we deem it harmless.[7]

---

7. Miller's "politics" argument is undeveloped. To the extent the beliefs he references are those of being "highly distrustful of

We have said that "[t]he CCP aggravator pertains specifically to the state of mind, intent, and motivation of the defendant." *Hilton v. State*, 117 So. 3d 742, 753 (Fla. 2013) (quoting *Wright v. State*, 19 So. 3d 277, 298 (Fla. 2009)). Here, the trial court permitted the State to introduce the items at issue for that purpose—i.e., to explain the intent and motivation underlying bizarre murders committed by an otherwise decorated Marine. The State's plausible theory was that Miller became radicalized online and adopted an extremist anti-government and anti-law-enforcement belief system under which he came to view—and abhor—all law enforcement as the tyrannical arm of a racist and oppressive system. So much so that police officers, no matter their skin color, represented a constant threat to black people, including Miller. The evidence contextualized the things going on in Miller's mind, with his anti-white posts being intimately tied up with his view of the police as institutionally racist. *Cf. United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) ("[E]vidence of [the defendant's] racist views

government and having a dislike for law enforcement," they clearly had probative value, as explained below.

- 22 -

not only demonstrated the context, motive, and setup of the crime, but was necessary to complete the story . . . .").  The items presented could help show that Miller had anger and hatred that could lead to the very violence in which he engaged, and against precisely the victims he chose.  Allowing the State to show that Miller acted on the hatred of law enforcement fueled by that mindset was not unfairly prejudicial.

Even if the trial court erred in allowing some of the evidence, any error was harmless.  The State did not make religion a feature of the penalty phase.[8]  And Miller's arguments regarding race are undermined by the fact that the defense itself made Miller's racism or lack thereof a theme in the penalty phase.  The defense's approach was to essentially establish that Miller had an untreated mental illness, had never been racist, and that his extreme Facebook posts (and other things) expressing hatred and anger

---

8.  We reject Miller's suggestion that the State painted him as a post-9/11 "Islamic extremist."  Moreover, this case was "not the prosecution of a religion." *Beasley*, 72 F.3d at 1526 n.7.  Indeed, MacNab made clear that the Moorish belief system is non-violent and has core beliefs or ideals that are harmless, including the promotion of entrepreneurialism and self-reliance.

- 23 -

were the product of that illness. In painting that picture, the defense brought up the racism issue through numerous defense witnesses, including Dr. Gold, who opined that Miller's anti-white posts supported a PTSD diagnosis. Another defense witness, Martin Hamann, who worked with Miller for a military contractor and became friends with Miller, even referenced anti-white posts the State had not introduced. Namely, Hamann testified on direct that he spoke with Miller after the August 2017 violent events that occurred in Charlottesville, Virginia, and could not understand why Miller would post things like "kill whitey." Unsurprisingly, the State used Hamann's testimony to then introduce a post Miller made, just days before the murders, about killing "all the whitey i see."

The defense made racism a theme to the point that the trial judge at sidebar during Hamann's testimony commented that defense counsel "repeatedly brought up, through every single witness, the racism issue." The record reflects that the judge was keenly aware and did not want the "anti-white sentiment" to become a theme. But the defense largely made it one.

The one case cited by Miller in his initial brief, *McDuffie v. State*, 970 So. 2d 312 (Fla. 2007), does not support a new penalty

phase. *McDuffie*—which had nothing to do with race, religion, or politics, and which involved cumulative error in the guilt phase—held that the trial court erroneously admitted, over objection, unfairly prejudicial testimony of the "inflammatory contents of a voice mail [the defendant left for someone who was not one of the victims] depicting [the defendant] as a person with a vicious temper who wishes on another individual a fate similar to that of the victims of the Washington, D.C./Baltimore area snipers." *Id.* at 326-28. According to *McDuffie*, the voice mail details "bore no relationship to the crimes" and were not "probative of whether [the defendant] committed robbery and murder." *Id.* at 328. Here, rather than bearing "no relationship to the crimes," MacNab's testimony and the additional Facebook posts could help to contextualize the crimes.

The four additional cases cited in Miller's reply brief are also not on point. *See Robinson v. State*, 520 So. 2d 1, 5-8 (Fla. 1988) (vacating death sentence where prosecutor's examination of defense's medical expert "was a deliberate attempt to insinuate that [defendant] had a habit of preying on white women," which "had no bearing on any aggravating or mitigating factors"); *Johnson v. State*,

61 So. 2d 179, 179 (Fla. 1952) (affirming a conviction and death sentence even though defendant's confession presented to the jury contained "expressions of [defendant's] political beliefs" that "were wholly immaterial and irrelevant"); *Torres v. State*, 124 So. 3d 439, 442 (Fla. 1st DCA 2013) (remanding for resentencing because sentencing judge's comments improperly suggested the judge's "condemnation of [defendant's] behavior was based on the court's own religious beliefs"); *Guerrero v. State*, 125 So. 3d 811, 812, 816 (Fla. 4th DCA 2013) (reversing conviction because prosecutor made defendant's alleged racial slurs "a feature," even though the slurs—unsurprisingly—"did not tend to prove any element of [battery or trespass]"). Here, the items were relevant and not unfairly prejudicial, and the defense made Miller's racial prejudice "a feature of" the penalty phase. We deny this claim.

## MacNab's Expert Status and Testimony

Related to the previous issue, Miller claims the trial court erred in even qualifying MacNab as an expert witness. Miller advances two undeveloped arguments in his initial brief, namely that MacNab's expository testimony during the penalty phase was "not relevant" and was "pure opinion testimony," and that she

lacked credentials and had "inherent bias."[9]

The parties agree our standard of review is abuse of discretion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-39 (1997) (holding that "abuse of discretion is the appropriate standard" that "an appellate court should apply in reviewing a trial court's decision to admit or exclude expert testimony under *Daubert*"). We conclude that to the extent this issue is adequately briefed—most of Miller's "argument" is merely a summary of MacNab's proffer, defense counsel's arguments at the *Daubert* hearing, and MacNab's penalty phase testimony—the trial court did not abuse its discretion in qualifying MacNab as an expert to provide expository testimony.

First, Miller asserts that MacNab's expository testimony was "not relevant" in that it "was not directly related to [Miller's] actions or beliefs," and was "pure opinion testimony" that "is no longer

9. In his reply brief, Miller asserts new arguments, including assailing MacNab's brand of "content analysis" and claiming that "whether to hold that content analysis as used in this case has sufficient scientific reliability is of first impression to this Court." But these "new arguments . . . were not raised in his initial brief" and are therefore "waived." *Truehill v. State*, 358 So. 3d 1167, 1186 n.12 (Fla. 2022). In any event, MacNab never discussed content analysis or offered an opinion during her penalty phase testimony.

admissible" in the wake of the Legislature's "*Daubert* amendment[s]." *See* ch. 2013-107, Laws of Fla. ("WHEREAS, by amending s. 90.702, Florida Statutes, the Florida Legislature intends to prohibit in the courts of this state pure opinion testimony as provided in *Marsh v. Valyou,* 977 So. 2d 543 (Fla. 2007) . . . ."). But Miller fails to show that the defense objected on these grounds. The most we find in the record is a general objection of "I object to that as well" after the trial judge, shortly before MacNab's testimony, stated that MacNab was "[t]here for expository testimony only, which is she has certain specialized training and experience to describe a belief system." This issue was not preserved.

Notwithstanding this waiver, Miller's argument is without merit. Although unclear, it appears he conflates "pure opinion testimony" and "expository testimony." But pure opinion testimony requires, at a minimum, "an expert's *opinion.*" *Marsh v. Valyou,* 977 So. 2d 543, 548 (Fla. 2007) (emphasis added) (quoting *Flanagan v. State,* 625 So. 2d 827, 828 (Fla. 1993)), *receded from by In re Amends. to Fla. Evidence Code,* 278 So. 3d 551, 551-52 (Fla. 2019). MacNab's non-opinion expository testimony, by definition, was not

pure opinion testimony.

To the extent Miller suggests expository testimony is always inadmissible in the wake of the *Daubert* amendments and this Court's adoption of "the *Daubert* standard . . . for expert testimony found in Federal Rule of Evidence 702," *In re Amends. to Fla. Evidence Code*, 278 So. 3d at 551-52 (footnote omitted), we disagree. Section 90.702, Florida Statutes, amended as part of the *Daubert* amendments, expressly contemplates that an expert may testify without offering an opinion. § 90.702, Fla. Stat. (2023) (permitting an expert to testify "in the form of an opinion *or otherwise*" if it "will assist the trier of fact" (emphasis added)). Miller offers no authority to the contrary. *See State v. Dobbs*, 945 N.W.2d 609, 621, 624 (Wis. 2020) (concluding that state evidence code, modeled after Federal Rule of Evidence 702, "permit[s] an expert witness to testify in the form of an opinion 'or otherwise,' including exposition testimony on general principles without explicitly applying those principles to, or even having knowledge of, the specific facts of the case" (quoting Wis. Stat. § 907.02(1))); *United States v. Galatis*, 849 F.3d 455, 462 (1st Cir. 2017) (concluding that expert testimony explaining the Medicare

"regulatory framework" without "appl[ying] the regulations to the facts of the case" or opining on the legality of the conduct at issue "was admissible under Federal Rule of Evidence 702").

Miller's second argument is that MacNab "has no academic credentials" and "no academic study" relating to "Moor beliefs or sovereign citizen extremists," and is purportedly "a pro-state zealot." We conclude that the trial court did not abuse its discretion in finding that MacNab had sufficient qualifications and in determining that certain "deficiencies," including her lack of any "degrees in the subject of her proposed testimony," would be "ripe for cross examination" if she testified at trial, but were "not a basis to exclude her testimony."

After an extensive proffer and *Daubert* hearing, the trial court concluded that MacNab had "sufficient knowledge and experience" regarding "the Moorish Sovereign Citizen Movement." The trial court reasoned in part as follows:

> The hearing transcript . . . sets forth years of work history, including research, lectures, consultations and training for organizations, on the subject of her proposed testimony. Although MacNab has no formal education or degrees in the subject of her proposed testimony, a lack of peer reviewed publications in the subject of her proposed testimony, and has never been qualified as an

> expert in the subject of her proposed testimony, she has devoted nearly 20 years of her life to the subject. While these deficiencies are ripe for cross examination . . . , it is not a basis to exclude her testimony.

The court later explained that MacNab "has used [the knowledge she gained over the years] in the past to present, lecture and consult with various organizations, such as the Federal Bureau of Investigation (FBI), Department of Homeland Security (DHS), Department of Justice (DOJ) and local law enforcement agencies."

We find no abuse of discretion. Section 90.702 permits a trial court to qualify an expert witness based on "knowledge, skill, experience, training, *or* education." (Emphasis added.) MacNab's extensive "knowledge" and "experience"—acquired over twenty years—supports the trial court's decision. *See Jackson v. Household Fin. Corp. III*, 298 So. 3d 531, 536 n.3 (Fla. 2020) ("Even with respect to expert testimony, oftentimes, the amount of training or experience required is minimal." (citing *Bell v. State*, 179 So. 3d 349, 357 (Fla. 5th DCA 2015))). To the extent Miller asks us to hold that any expert—in anti-government extremism or otherwise—must possess certain academic credentials or study, we decline to rewrite section 90.702. We deny this claim.

## CCP

Miller next argues the trial judge erred in finding the CCP aggravator. That aggravator requires proof of four elements, namely that

> the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.

*Joseph v. State*, 336 So. 3d 218, 239 (Fla. 2022) (quoting *Franklin v. State*, 965 So. 2d 79, 98 (Fla. 2007)). Miller claims the "calculated" and "heightened premeditation" elements are lacking. *See Campbell v. State*, 159 So. 3d 814, 831 (Fla. 2015) ("Evidence proving heightened premeditation can sometimes overlap with evidence proving the prearranged plan necessary to establish CCP."). He argues the murders were "unplanned" and that premeditation formed only after he was alone with both Officers.

Miller largely asks this Court to reweigh or reassess evidence, something we do not do "[w]hen reviewing claims alleging error in the finding of aggravating factors." *Id.* at 830 (citing *Franklin*, 965 So. 2d at 98). "Rather, this Court's role is to review the record to

determine whether the trial court applied the correct rule of law . . . and, if so, whether competent, substantial evidence exists to support its findings." *Id.* (citing *Franklin*, 965 So. 2d at 98). Here, the sentencing order thoroughly addresses each element of CCP and how it was established by the evidence. Our review of the record leaves undisturbed the finding of CCP.

"A determination of whether CCP is present is properly based on a consideration of the totality of the circumstances." *Colley v. State*, 310 So. 3d 2, 13 (Fla. 2020) (quoting *Gill v. State*, 14 So. 3d 946, 962 (Fla. 2009)). We have said that "CCP can be indicated by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course." *Ballard v. State*, 66 So. 3d 912, 919 (Fla. 2011) (citing *Swafford v. State*, 533 So. 2d 270 (Fla. 1988)). Those are plainly "the circumstances" here, given the execution-style killings committed without provocation or much if any resistance, with a weapon Miller had shown Albright weeks earlier while discussing a potential police encounter. In any event, we address the two disputed elements.

The "calculated" element of CCP requires "a careful plan or prearranged design to commit murder." *Joseph*, 336 So. 3d at 239 (quoting *Franklin*, 965 So. 2d at 98). Here, competent, substantial evidence supports the trial court's conclusion that Miller had a "prearranged design to commit violence upon law enforcement officers" and that he expressed that prearranged design "before and after the murders in several different ways." That evidence includes: Miller's Facebook posts; Miller showing Albright the small firearm and claiming he was "not gonna be another statistic"; Miller's jailhouse comments; Miller's comment in Roscoe's that the Officers "got what they deserved"; Miller summoning a second officer to the scene; and the execution-nature of the killings using a concealable firearm Miller was proficient in using to shoot bullets into a target's head. One can conclude from this body of evidence that the killings were "calculated." *See Russ v. State*, 73 So. 3d 178, 194 (Fla. 2011) ("[W]here a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of 'calculated' is supported.").

The "premeditated" element of CCP "is heightened premeditation, defined as 'deliberate ruthlessness.'" *Ballard*, 66

So. 3d at 919 (quoting *Wuornos v. State*, 644 So. 2d 1000, 1008 (Fla. 1994)). Although "heightened premeditation" requires some period of reflection, there is no "bright-line rule for how much reflection suffices." *Colley*, 310 So. 3d at 14. Miller certainly had time to reflect, given that he requested the presence of a second officer and then managed to shoot two armed officers with point-blank shots to the head. The execution-style nature of the murders supports this element, *see Chamberlain v. State*, 881 So. 2d 1087, 1107 (Fla. 2004) ("[W]holly unnecessary, execution-style murders are prime examples of the 'deliberate ruthlessness' for which application of the CCP aggravating factor is reserved."), as does the other evidence relied on by the trial court. The court quite sensibly determined the most "reasonable sequence of events" was that Miller shot each Officer to the back left side of the head (shooting the larger Sergeant Howard first), and then positioned the bodies before shooting each Officer directly in the face. Needless to say, such "conduct . . . exhibited deliberate ruthlessness." *Bonifay v. State*, 680 So. 2d 413, 419 (Fla. 1996).

Miller's fact-based arguments are unavailing. For example, his assertion that he "was always armed" is irrelevant, even more so

given that he showed Albright a similar weapon and made comments indicating preparedness for a police encounter. Just as irrelevant—even if true—is Miller's claim he did not target these two specific Officers. *See Bell v. State*, 699 So. 2d 674, 678 (Fla. 1997) ("The focus of the CCP aggravator is the manner of the killing, not the target." (citing *Sweet v. State*, 624 So. 2d 1138, 1142 (Fla. 1993))). In any event, at a minimum, Miller targeted "law enforcement personnel" generally. *See Howell v. State*, 707 So. 2d 674, 682 (Fla. 1998) (upholding CCP where defendant "had sufficient opportunity to formulate the intent that law enforcement personnel would be the bomb's intended victim").

Lastly, we have upheld CCP in certain cases in which the defendant murdered a police officer not long after becoming ensnared in a police inquiry. *See Jackson v. State*, 704 So. 2d 500, 501-02, 504-05 (Fla. 1997) (defendant self-vandalized her car and then murdered officer who was preparing the police report and who attempted to arrest defendant); *Valle v. State*, 581 So. 2d 40, 43, 48 (Fla. 1991) (defendant executed officer during traffic violation stop). CCP is far more compelling here, where Miller, who had been making hateful anti-law-enforcement posts, executed two officers

after inserting himself into a situation having nothing to do with him.  We deny this claim.

## Miller's Mental Health "Defense"

In Miller's only guilt phase claim, he argues the trial judge erroneously excluded what Miller describes as "heat of passion evidence through the use of mental health experts."  Miller asserts the trial judge "erroneously believed that [Miller] was attempting to present a diminished mental capacity defense."  We conclude that the trial court carefully and correctly ruled on the issue.

During guilt phase opening, defense counsel conceded the murders and argued it was "appropriate for a lesser included offense to be considered by the jury," on the ground that premeditation was lacking.  Defense counsel argued Miller's life leading up to the murders was "the perfect storm" in that Miller: had worked in Kabul; began having nightmares and being jumpy "around 2013"; "deteriorate[d] through 2016 after he return[ed] to . . . Kissimmee"; had "difficulty adjusting to civilian life"; was "laid off" in May 2017; was "drinking" and "smoking weed" to self-medicate; "sought help from the VA"; had a breakup with his girlfriend and "didn't have any place to live"; "started posting crazy

things on Facebook"; was committed under the Baker Act one month before the murders; and "suffered from depression, anxiety, nightmares." And defense counsel stressed that "the why" was important.

The State responded by filing a motion arguing that evidence of Miller's drinking or marijuana use was prohibited by section 775.051, Florida Statutes, and that the defense was otherwise presenting a "general, abnormal mental condition defense" long deemed inadmissible by this Court. The trial court largely agreed, concluding that: evidence Miller was self-medicating with drugs or alcohol was inadmissible under section 775.051, which provides that "[v]oluntary intoxication . . . is not a defense"; evidence regarding Miller being committed or suffering from depression or anxiety was inadmissible evidence of abnormal mental condition; and all other items would only be excluded if the defense attempted to relate them to a mental condition. The trial court did not err in precluding Miller's approach to negating premeditation.

Premeditation, of course, "is the key element that separates first-degree murder from second-degree murder." *Twilegar v. State*, 42 So. 3d 177, 190 (Fla. 2010) (citing *Randall v. State*, 760 So. 2d

892, 901 (Fla. 2000)).  Although a defendant is free to argue that premeditation is lacking, a defendant may not—as Miller attempted to do—present "evidence of diminished mental capacity . . . to negate the specific intent required to convict of first-degree premeditated murder."  *Chestnut v. State*, 538 So. 2d 820, 820 (Fla. 1989);[10] *see also Evans v. State*, 946 So. 2d 1, 11 (Fla. 2006) ("[D]iminished capacity is not a viable defense in Florida."); *Hodges v. State*, 885 So. 2d 338, 352 n.8 (Fla. 2004) ("[E]vidence of an abnormal mental condition not constituting legal insanity is inadmissible to negate specific intent."); *Kight v. State*, 512 So. 2d 922, 929 (Fla. 1987) ("[I]n the absence of a plea of not guilty by reason of insanity, testimony concerning a defendant's mental state is inadmissible during the guilt phase of a trial."), *disapproved of on other grounds by Owen v. State*, 596 So. 2d 985 (Fla. 1992); *Zeigler v. State*, 402 So. 2d 365, 373 (Fla. 1981) ("During the guilt phase of the trial, testimony regarding the mental state of a defendant in a criminal case is inadmissible in the absence of a plea of not guilty

10.  *Chestnut* recognized that such evidence might, however, be "appropriate" in "mitigation."  538 So. 2d at 825.  Here, Miller did present the evidence in mitigation.

by reason of insanity." (citing *Tremain v. State*, 336 So. 2d 705 (Fla. 4th DCA 1976))).

The clear import from defense counsel's opening statement is that Miller was mentally unwell and thus did not—or could not—form the specific intent to commit premeditated first-degree murder. Indeed, Miller acknowledges his "theory of defense" was that "an unspecified mental illness . . . should permit the jury to find a verdict of second[-]degree murder." Our caselaw does not permit that type of "defense."

The cases Miller cites are easily distinguished, as they involve evidence regarding seizures, *e.g.*, *Bunney v. State*, 603 So. 2d 1270, 1273 & n.1 (Fla. 1992), or certain "state-of-mind evidence" to prove self-defense, *e.g.*, *State v. Mizell*, 773 So. 2d 618, 620-21 (Fla. 1st DCA 2000). Miller's case does not involve seizures or self-defense. We deny this claim.

## Adequacy of Florida's Capital Scheme

Miller argues that "Florida's capital scheme, as administered in 2021, fails to adequately reduce the risk of arbitrary infliction of death sentences." Miller asserts that "multiple vital safeguards for [Florida's] system have either been eliminated or eroded" since

*Proffitt v. Florida*, 428 U.S. 242 (1976). Miller's "safeguards" argument is based on these three developments in our law: (1) *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), which eliminated comparative proportionality review; (2) *Bush v. State*, 295 So. 3d 179 (Fla. 2020), which eliminated what Miller describes as "the 'reasonable hypothesis of innocence' motion for judgment of acquittal"; and (3) "aggravator creep." Miller's argument fails under our caselaw.

Recently, this Court in *Wells v. State*, 364 So. 3d 1005 (Fla. 2023), upheld a death sentence against a constitutional challenge based on two of the three purported infirmities alleged by Miller, namely "the sheer number of aggravating factors in the statute combined with [this Court's comparative proportionality] holding in *Lawrence*." *Id.* at 1015. *Wells* first noted that this Court, "even with the statute in its current form," had "repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty." *Id.* (citing cases). *Wells* then explained that *Lawrence* "d[id] not alter our analysis." *Id.* On that point, *Wells* reasoned that "*Lawrence* recognized that

- 41 -

comparative proportionality review was not an integral component of the Eighth Amendment." *Id.* (citing *Lawrence,* 308 So. 3d at 548-50, 552).

Our decision in *Bush* similarly "does not alter our analysis." *Id.* *Bush* merely abandoned a "special appellate standard" that "used a different standard to evaluate evidence on appeal in a wholly circumstantial evidence case than in a case with some direct evidence." 295 So. 3d at 184. *Bush* discontinued the use of that standard because it was "unwarranted, confusing, and out of sync with both the jury instructions currently used in this state and the approach to appellate review used by the vast majority of the courts in this country." *Id.* at 199. Miller fails to explain how eliminating a confusing and unwarranted standard of review creates a constitutional problem. We deny this claim.

## Mercy Instruction

Miller next argues the trial court committed "structural" error by denying his request for an express jury instruction on mercy and instead reading Florida Standard Jury Instruction (Criminal) 7.11. Miller's "argument that he was entitled to a jury instruction on mercy is . . . without merit." *Bush,* 295 So. 3d at 210. Indeed,

Miller acknowledges this issue is foreclosed by our caselaw.

In *Woodbury v. State*, 320 So. 3d 631 (Fla. 2021), for example, the trial court rejected similar requested special jury instructions on mercy and instead read Standard Jury Instruction 7.11, the relevant portion of which provided: "Regardless of the results of each juror's individual weighing process . . . the law neither compels nor requires you to determine that the defendant should be sentenced to death." *Id.* at 655-56. *Woodbury* affirmed, reasoning that Standard Jury Instruction 7.11 "adequately informed the jurors of the applicable legal standard" and was "not ambiguous when it comes to addressing the jurors' options." *Id.* at 656. *Woodbury* also noted that this Court has "referred to the relevant provision of Standard Instruction 7.11 as the 'mercy instruction.' " *Id.* (quoting *Reynolds v. State*, 251 So. 3d 811, 816 n.5 (Fla. 2018)). According to *Woodbury*, the trial court thus "*did* read an instruction on mercy." *Id.* Here, although Miller "might have preferred the wording of his proposed instruction," *id.*, the trial court did not err in reading Standard Jury Instruction 7.11. We deny this claim.

## Victim Impact Evidence

Miller next argues that introduction of the victim impact

- 43 -

videos "in penalty phase rebuttal" rendered the trial fundamentally unfair. The videos, played without music, span approximately eight minutes and show photo montages of both Officers. Miller does not take issue with any specific photos or the length of the videos, just "the timing and placement of the evidence" that was purportedly played "just before jury deliberations."

The parties agree our standard of review is abuse of discretion. *See Kalisz v. State*, 124 So. 3d 185, 211 (Fla. 2013) ("A trial court's decision to admit victim impact testimony is reviewed for an abuse of discretion."). Under that deferential standard, we "will not find an abuse of discretion unless the trial court makes a ruling which no reasonable judge would agree with." *Wells*, 364 So. 3d at 1013. We conclude that the trial court did not abuse its discretion under the circumstances. Even assuming an error occurred, it was not "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). In other words, no fundamental error or due process violation occurred. *See Braddy v. State*, 111 So. 3d 810, 858 (Fla. 2012) ("The analysis to determine if admission of victim impact evidence has violated a defendant's due process rights in the penalty phase of a capital trial

parallels the analysis for fundamental error." (quoting *Wheeler v. State*, 4 So. 3d 599, 607 (Fla. 2009))).

The record establishes that two nights before the penalty phase began, the defense objected to portions of the videos despite being provided the videos "months in advance." When the penalty phase began on Tuesday, November 5, 2019, the prosecutor informed the judge that edits to the videos would take time and requested permission to play the videos during rebuttal. In agreeing to that request, the court relied on "the lateness of the objections," juror inconvenience, the absence of constitutional "limits on when [victim impact information] can be provided," and limiting instructions that would be given.

By Friday, November 8, 2019, the State had presented its case-in-chief and certain victim impact statements, and the defense had called all but one witness, Dr. Cohen, who was unavailable. So, the State called some rebuttal witnesses, and the court adjourned for a long weekend. On Tuesday, November 12, 2019—the day before closing arguments—the videos were played before the remaining witnesses were called so that the videos were not the final items of evidence introduced before closing argument. The

court explained to the jurors why the information had not "been played earlier" with "the victim impact statements." The court also read a limiting instruction before and after the videos were played, explaining the purpose for which the videos were presented and instructing the jurors not to consider the information as evidence of an aggravating factor. The defense then called Dr. Cohen, followed by the State calling the remaining rebuttal witnesses.

As recognized by the trial judge, there does not appear to be any authority for the proposition that victim impact information "can only be presented in the State's case-in-chief." The statute governing the admission of victim impact evidence, section 921.141(8), Florida Statutes, does not squarely address the issue, although the statute arguably suggests the information will generally be presented during the State's case-in-chief. § 921.141(8), Fla. Stat. (allowing the prosecution to introduce and argue victim impact evidence after "the prosecution has provided evidence of the existence of one or more aggravating factors"). Nor has our caselaw addressed this issue.[11] Indeed, neither party cited

---

11. The State cites *Morris v. State*, 219 So. 3d 33 (Fla. 2017), but the "additional victim impact testimony" there was presented

- 46 -

any case—from any jurisdiction—addressing victim impact evidence presented during penalty phase rebuttal.

Given the circumstances (caused by the defense), the reasonable steps taken by the trial court (including the explanation and unobjected-to limiting instructions given to the jury), the highly deferential standard of review, and the absence of a per se bar to ever presenting victim impact evidence during rebuttal, we deny this claim.

## Sufficiency of the Evidence

Lastly, even though Miller does not challenge the sufficiency of the evidence, this Court independently reviews the record in all death penalty cases to determine whether competent, substantial evidence supports the murder convictions. *See* Fla. R. App. P. 9.142(a)(5); *Pham v. State*, 70 So. 3d 485, 501 (Fla. 2011). In conducting this review, we "view[] the evidence in the light most favorable to the State" and ask whether "a rational trier of fact could have found the existence of the elements of the crime beyond

---

"[a]t the subsequent *Spencer* hearing," not during penalty phase rebuttal. *Id.* at 39 (footnote omitted).

a reasonable doubt." *Allen v. State*, 322 So. 3d 589, 603 (Fla. 2021) (quoting *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)).

To prove first-degree premeditated murder, the State was required to establish the following three elements: (1) the victim is dead; (2) the death was caused by the criminal act of the defendant; and (3) the victim's death was premeditated. *Id.* (citing *Glover v. State*, 226 So. 3d 795, 804 (Fla. 2017)). Here, sufficient evidence supported the convictions.

The State presented extensive evidence, including eyewitness testimony, video evidence, forensic evidence, and the murder weapon itself, that placed Miller at the scene and directly tied him to the murders. Premeditation, which "may be inferred" from the evidence, *Glover*, 226 So. 3d at 806 (quoting *Sochor v. State*, 619 So. 2d 285, 288 (Fla. 1993)), was also sufficiently established, given that, among other things, Miller had been making hateful anti-police social media posts leading up to the murders, angrily inserted himself into a situation having nothing to do with him, requested the presence of a second officer and then shot both Officers execution-style—using a single-action firearm requiring two separate decisions for each bullet fired—while taking the time to

pose the bodies.

### III. CONCLUSION

For the reasons stated above, we affirm Miller's convictions and death sentences.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

I continue to adhere to my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), wherein this Court abandoned this Court's decades-long practice of comparative proportionality review in the direct appeals of sentences of death. For this reason, I can only concur in the result.

An Appeal from the Circuit Court in and for Osceola County,
 Greg Allen Tynan, Judge
 Case No. 492017CF002906XXXAXX

Matthew Metz, Public Defender, George D.E. Burden, Assistant Public Defender, and Kathryn R. Radtke, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida,

 for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Patrick Bobek, Assistant Attorney General, Daytona Beach, Florida,

for Appellee